Hon. EDGAR N. HARWOOD, ⎱
Hon. WILLIAM H. DE WITT, ⎰ Associate Justices.

---

### IN RE RICKER'S ESTATE.

[Submitted March 7, 1893.    Decided March 12, 1894.]

EXECUTORS—*Resulting trust.*—The doctrine of equity that a trustee shall not be permitted to make any profit by the use of trust funds does not warrant the creation of a resulting trust in favor of an heir, in lands which an executor has purchased, using trust funds to the extent of one-half the purchase price, where, punctually and as directed by the will, he accounted for the funds so used with compound interest.

SAME—*Commissions.*—Where the administration of an estate continues over a period of years, an executor may properly charge the estate at the close of each year, with the commission allowed by law on funds of the estate, actually disbursed during the preceding year. (*In re Dewar's Estate,* 10 Mont. 426, distinguished.)

SAME—*Compromise of claims.*—Where an executor has compromised a claim due the estate after collecting some payments from time to time from the debtors, who were generally regarded as insolvent, he should not be charged with the amount rebated from the debt upon the mere showing that for several years during the running of the debt title to certain land stood in the name of one of the debtors, and which property was conveyed for a consideration, as stated in the deed, much larger than the amount of his indebtedness to the estate, it

not appearing that such property was subject to execution, or that the consideration in the deed represented the value.

SAME—*Use of trust funds—Interest.*—An executor who has retained in his hands funds of the estate which should have been deposited in bank at interest, should not be required, in an equitable accounting, to pay arbitrary rates of interest upon such funds in excess of the statutory rate, particularly where he accounted for a higher rate than the banks, wherein the money was ordered deposited, would have paid.

SAME—*Commission—Review on appeal.*—An objection that an executor was allowed a higher rate of commission in certain years than the statute allowed, cannot be raised for the first time on appeal.

*Appeal from First Judicial District, Lewis and Clarke County.*

ACTION for an accounting against an executor. The cause was tried before BUCK, J., who rendered a decree for petitioners. Reversed.

*Massena Bullard* and *D. S. Wade*, for the Executor, Appellant.

I.   We admit at the outset that an executor or trustee must make no profit or gain to himself of any kind, upon or out of the funds in his hands as such executor or trustee. It is so declared in our statute, and the statute but expresses in definite words the effect of numerous decisions.   Courts have sometimes enforced this rule and principle with such rigor, and at other times with such laxity, that Chancellor Sanford, in the case of *Clarkson* v. *De Peyster*, 1 Hopk. Ch. 505, in defining the duties and liabilities of trustees, applied the rule as follows: "A jealous severity, which would deter prudent men from accepting these trusts, and a lax indulgence which would invite men to accept them for gain, are extremes which are equally inexpedient."

II.   The failure to invest in government securities was not malversation or breach of trust. The court had the inherent authority and power to make the order concerning the investment of these funds, when it became necessary so to do for the protection or preservation of the funds and the interests of the legatees, or if it became impossible or impracticable to carry out the provisions of the will concerning investments.   (Crosswell on Executors and Administrators, § 439; Schouler on Executors and Administrators, § 335; *Twaddell's Appeal*, 5 Pa. St. 17; *Lansing* v. *Lansing*, 45 Barb. 182; *Gray* v. *Lynch,*

8 Gill, 405.) In cases of unauthorized varying of the securities, the trustee takes upon himself the burden of proving entire *bona fides*, and that there was reasonable ground to believe that the fund would be benefited; and if this can be shown, the courts will sustain his action. (*Washington* v. *Emery*, 4 Jones Eq. 32; *Cornwise* v. *Bourgum*, 2 Ga. Dec. 15.) The directions of the will are not to be followed, if the funds of the estate would be lost or injured thereby. It would have been waste, and a squandering of the funds of the estate, to have invested its funds as directed by the will. For all practical purposes government bonds could not have been obtained. They were from 17 to 20 per cent premium, bearing but 5 per cent interest, which was soon after reduced to 4 per cent interest, and to have purchased them would have required the payment from the estate funds of from $2,500 to $3,000 in premiums, which sum would have been entirely lost to the estate, and when the bonds were obtained it would have required three and one-half years' interest thereon to have paid this premium. This order of the court, as to investing the funds, relieved the estate from the payment of a burdensome premium, and has enabled the executor to add to the value of the estate about $16,000 in interest received and accounted for by him. But suppose there had been a breach of trust in not following the will as to investments, what are the consequences? The executor only becomes personally liable for losses if the investment he made did not equal the investments directed by the will. (See Schouler on Executors and Administrators, § 329, and note.) In such a case the standard or measure of loss would be what would have been made or realized by the estate or legatees if the directions of the will had been followed. The court will inquire and ascertain the amount due if the will had been followed. (1 Perry on Trusts, § 472.) If the executor accounts for more than he would have realized by following the will, and has made no profit for himself, the legatees cannot complain. They have no cause of complaint if they have not been injured, and the executor has not been benefited. The case is analogous to that of a statute requiring trustees to invest in certain securities, but they fail to do so, and invest in others not named in the statute, in which cases

the trustees are only required to make good the losses in consequence of departing from the statute. (See 1 Perry on Trusts, 553, and note; Schouler on Executors and Administrators, § 336.) And so trustees may elect to invest in securities not named in a statute, and if they so elect they only become responsible for losses. The rule is fully stated by Lord Cottenham and quoted in Schouler on Executors and Administrators, section 336. Even in such cases, if the trustee acts in good faith, and exercises good judgment, and there is a loss, he will be protected. (See *Twaddell's Appeal*, 5 Pa. St. 18.) Undoubtedly, the same rule would be applied to a will directing certain investments, and especially in a case where, by departing from the will, the estate and legatees had been greatly benefited. (See *Smith* v. *Wellington etc. Co.*, 83 Ill. 498; *Richardson* v. *Knight*, 69 Me. 285.)

III.   The trial court directs that the executor be charged with compound interest upon the funds in his hands at the rate of 18 per cent per annum from July 21, 1875, to August 31, 1880; from August 31, 1880, to January 20, 1885, with compound interest at the rate of 15 per cent per annum; and from January 20, 1885, to the date of the exhibit filed herein, at the rate of 12 per cent compound interest per annum. Having found that the executor mingled the trust funds with his own, from the fact that all of the trust funds were not at all times deposited in the banks, then follows the order as to the rates of interest to be charged, which order is based upon the testimony of certain bank officers, who testified that money might have been loaned, not indeed at compound, but at simple interest, at the rates and between the dates above mentioned. There is no testimony in the case tending to show at what rates money might have been loaned between those dates at compound interest for a series of years. But the injustice of charging an executor with compound interest at these rates for a long series of years will be realized when it is remembered that in loaning money for a long number of years, with the utmost vigilance and care, there are always losses, and always times of depression and stagnation when money cannot be loaned at all. (*King* v. *Talbot*, 40 N. Y. 95.) Even in old and well-established communities there are periods of

depression and stagnation which prevent or make unsafe the loaning of money. For these reasons courts hold that it would be unjust and a hardship to charge an executor or trustee with the full legal rate of simple interest on funds in his hands for a series of years. To charge compound interest against a trustee for a long series of years, upon the supposition that he has received, or that it would be possible for him to have received, such interest, is against the common experience of the business world. Interest is not charged against a trustee under such circumstances to take from him what he has not received. Compound interest will not be charged or allowed as a penalty, or to punish the executor or trustee. It is only resorted to as a means to compel the trustee to refund the interest he has actually received, or that he is presumed actually to have received. (See *Utica Ins. Co.* v. *Lynch*, 11 Paige, 524; *Hood's Estate*, 1 Tuck. 396; *Prescott's Estate*, 1 Tuck. 430; *Spear* v. *Tinkham*, 2 Barb. Ch. 213; *Manning* v. *Manning*, 1 Johns. Ch. 527; *McKnight* v. *Walsh*, 24 N. J. Eq. 498; *English* v. *Harvey*, 2 Rawle, 305; *In re Harland's Accounts*, 5 Rawle, 329; *Light's Appeal*, 24 Pa. St. 181; *McCall's Estate*, 1 Ashm. 357; *Barney* v. *Saunders*, 16 How. 535; *Williams* v. *Petticrew*, 62 Mo. 460; *Scott* v. *Crews*, 72 Mo. 261; *Boynton* v. *Dyer*, 18 Pick. 1; *De Peyster* v. *Clarkson*, 2 Wend. 77; *Ackerman* v. *Emott*, 4 Barb. 626; *Garniss* v. *Gardiner*, 1 Edw. Ch. 128; *Lansing* v. *Lansing*, 45 Barb. 182; *Fay* v. *Howe*, 1 Pick. 527, and note; *Clemens* v. *Caldwell*, 7 B. Mon. 171; *Luken's Appeal*, 7 Watts & S. 48; *Fall* v. *Simmons*, 6 Ga. 272; *Cartledge* v. *Culiff*, 21 Ga. 1; 1 Perry on Trusts, § 471; *Hughes* v. *People*, 111 Ill. 457; *Wilmerding* v. *McKesson*, 103 N. Y. 329; *Graver's Appeal*, 50 Pa. St. 189.) Again, by what theory or principle is the executor required to pay interest from the very day of his appointment, when he is compelled to hold the funds of the estate in his possession for the purpose of paying the debts until a year from that date? In 1 Perry on Trusts, fourth edition, section 462, it is said: "A year is a reasonable time within which an executor may call in a testator's estate and pay off his liabilities, and it is necessary during that time that the executor should keep the money on hand. As a general rule executors and administrators are not

chargeable with interest for one year after they have taken out letters (that time being allowed them to get in the estate and settle their accounts), unless they have actually received it, or have used the money during that time." (*Fox* v. *Wilcocks*, 1 Binn. 194; 2 Am. Dec. 433; *Verner's Estate*, 6 Watts, 250; *Findlay* v. *Smith*, 7 Serg. & R. 264; *Bitzer* v. *Hahn*, 14 Serg. & R. 232; *Commonwealth* v. *Mateer*, 16 Serg. & R. 416; *Walthour* v. *Walthour*, 2 Grant Cas. 102; Levin on Trusts, 279; *Ogilvie* v. *Ogilvie*, 1 Bradf. 356; *Jacot* v. *Emmett*, 11 Paige, 145.) After the expiration of one year interest begins to run on the balance found in their hands on the annual accounting· (*McCall's Estate*, 1 Ashm. 357; *Boynton* v. *Dyer*, 18 Pick. 2; *Gilman* v. *Gilman*, 2 Lans. 1.) "Where sums have been received after that time the court will allow six months from the time of the receipt before the charge of interest is to commence." (*Worrell's Appeal*, 23 Pa. St. 44; *Dunscomb* v. *Dunscomb*, 1 Johns. Ch. 511; 7 Am. Dec. 504; *McKnight* v. *Walsh*, 24 N. J. Eq. 498; *Voorhees* v. *Stoothoff*, 11 N. J. L. 155; *Cogswell* v. *Cogswell*, 2 Edw. Ch. 231; see 7 Am. & Eng. Ency. of Law, 427, and notes.)

IV. The foregoing considerations are of weight in fixing the rate of interest with which this executor should be charged. There is no testimony in the case showing, or tending to show, that the executor mingled the funds of the estate with his own funds, or that he used the funds of the estate in his private business, except the fact that his annual reports or accounts, taken in connection with the bank statement of money on deposit in the name of the executor, show that all the funds of the estate were not kept on deposit by the executor in the banks. The complaint is not that the executor has not accounted for these sums of money assumed by him, together with interest thereon, or that he has not accounted for the balances in his hands from year to year, or that he has not accounted for every dollar that ever came into his hands· belonging to the estate, together with interest thereon. All this is admitted, but the claim is that he has not accounted for· all the interest with which he is legally chargeable.

V. The testimony does not support the finding of the, court that the executor mingled the funds of the estate with

his own, and used them in his private business. It is shown that the balances not deposited in the banks were the debts of insolvent debtors assumed by the executor and the amounts required to be kept on hand for the widow. But if the finding of the court were true, and supported by the evidence, is the conclusion of the court thereon that the executor should be charged with compound interest at the rate of 18, 15, and 12 per cent per annum authorized or justified by the law? Mr. Perry, in his work on Trusts, which is cited as authority by the highest courts of the country, in volume 1, fourth edition, section 468, answers the question as follows: "If a trustee retains balances in his hands which he ought to have invested, or delays for an unreasonable time to invest, or if he mingles the money with his own, or uses it in his private business, . . . . he will be liable to pay simple interest at the rate established by law as the legal rate in the absence of special agreements." This is exactly what the court found that this executor did. ",That the said William A. Chessman mixed large sums of money belonging to the said estate with his private funds, and used the same on his own account," and for doing which the court charges him, not with simple interest at the statutory rate, in the absence of special agreements, but with compound interest at illegal rates, except for special agreements. Our statutory rate, in the absence of special agreement, is simple interest at the rate of 10 per cent per annum, and there is no statute, and never has been in our territory or state, authorizing compound interest at any rate whatever, either in favor of a dead or live man. (*King* v. *Talbot*, 40 N. Y. 86; *Nelson* v. *Hagerstown Bank*, 27 Md. 53; *Duffy* v. *Duncan*, 35 N. Y. 187; *Young* v. *Brush*, 38 Barb. 294; *Owen* v. *Peebles*, 42 Ala. 338; *Wistar's Appeal*, 54 Pa. St. 60; *Newton* v. *Bennett*, 1 Brown Ch. 359; *Littlehales* v. *Gascoyne*, 3 Brown Ch. 73; *Mousley* v. *Carr*, 4 Beav. 49; *Mumford* v. *Murray*, 6 Johns. Ch. 1; *Jacot* v. *Emmett*, 11 Paige, 142; *Kellett* v. *Rathbun*, 4 Paige, 102; *De Peyster* v. *Clarkson*, 2 Wend. 77; *Garniss* v. *Gardiner*, 1 Edw. Ch. 128; *Spear* v. *Tinkham*, 2 Barb. Ch. 211; *Manning* v. *Manning*, 1 Johns. Ch. 527; *Brown* v. *Ricketts*, 4 Johns. Ch. 303; *Williamson* v. *Williamson*, 6 Paige, 298; *Dunscomb* v. *Dunscomb*, 1 Johns.

Ch. 508; 7 Am. Dec. 504; *Minuse* v. *Cox*, 5 **Johns. Ch.** 448; 9 Am. Dec. 313; *Cogswell* v. *Cogswell*, 2 Edw. Ch. **231;** *Gray* v. *Thompson*, 1 Johns. Ch. 82; *Armstrong* v. *Miller*, 6 Ohio, 118; *Aston's Estate*, 5 Whart. 228; *Worrell's Appeal*, 23 **Pa.** St. 44; *Graver's Appeal*, 50 Pa. St. 189; *Hess' Estate*, 68 Pa. St. 454; *Peyton* v. *Smith*, 2 Dev. & B. Eq. 325; *Jameson* v. *Shelby*, 2 Humph. 198; *Dyott's Estate*, 2 Watts & S. 565; *Kerr* v. *Laird*, 27 Miss. 544; *Lomax* v. *Pendleton*, 3 Call, 538; *Handly* v. *Snodgrass*, 9 Leigh, 484; *Carter* v. *Cutting*, 5 Munf. 223; *Wood* v. *Garnett*, 6 Leigh, 271; *Griswold* v. *Chandler*, 5 N. H. 497; *Lund* v. *Lund*, 41 N. H. 355; *Turney* v. *Williams*, 7 Yerg. 172; *Wright* v. *Wright*, 2 McCord Eq. 185; *Knowlton* v. *Bradley*, 17 N. H. 458; 43 Am. Dec. 609; *McKim* v. *Hibbard*, 142 Mass. 422; *In re Myers*, 131 N. Y. 409. To the same effect are numerous authorities cited in 7 Am. & Eng. Ency. of Law, 426, note 3.) This rule is subject to the qualification that the trustee shall make no profit out of the trust fund. But there is no proof that this executor made any profit whatever out of the trust fund, or that he ever used the same to his own gain or advantage in any manner. And it has been heretofore pointed out that for this long series of years, and in this country, the executor could not have loaned this considerable sum of money, and received any greater amount of interest than he has accounted for. The principle of computation and the manner of charging a trustee with interest, where he has mingled the trust fund with his own, as announced in the De Peyster case, runs all through the decisions, in cases where there is no fraud or willful breach of trust, the principle being to avoid charging interest as a penalty, and to arrive at the exact amount of interest the trustee has received or that he is presumed to have received. In 1 Perry on Trusts, section 468, the principle is stated in this way: "The proper mode of taking the account of trustees is to treat all the income of the trust received during the current year as unproductive; and to charge against the income of the current year all the disbursements, including the compensation or commissions of the trustee for the same year, and to strike a balance, upon which, as a general rule, interest is to be allowed, but in such a way as not to compound it," citing the following

authorities in support of the proposition: *Boynton* v. *Dyer*, 18 Pick. 1; *Pettus* v. *Clawson*, 4 Rich. Eq. 92; *Jones* v. *Morrall*, 2 Sim., N. S., 241; *De Peyster* v. *Clarkson*, 2 Wend. 77; *Vanderheyden* v. *Vanderheyden*, 2 Paige, 288; 21 Am. Dec. 86; *Luken's Appeal*, 47 Pa. St. 356; *Reynolds* v. *Walker*, 29 Miss. 250; *Roach* v. *Jelks*, 40 Miss. 754; *Crump* v. *Gerock*, 40 Miss. 765; *Rowland* v. *Best*, 2 McCord Eq. 317; *Jordan* v. *Hunt*, 2 Hill Eq. 145; *Walker* v. *Bynum*, 4 Desaus. Eq. 555; *Powell* v. *Powell*, 10 Ala. 900; *Sheppard* v. *Starke*, 3 Munf. 29; *Burwell* v. *Anderson*, 3 Leigh, 348; *Garrett* v. *Carr*, 3 Leigh, 407; *Campbell* v. *Williams*, 3 T. B. Mon. 122; *Jones* v. *Ward*, 10 Yerg. 160; *Elliott* v. *Sparrell*, 114 Mass. 404. See, also, 7 Am. & Eng. Ency. of Law, 429; *Callaghan* v. *Hall*, 1 Serg. & R. 241.

VI. As to the land found by the court to have been purchased by the executor in his own name with funds of the estate, we contend that there is no testimony whatever to support, authorize, or justify the finding. It has not even a presumption in its favor. It has nothing more than a vague, shadowy suspicion or conjecture upon which to rest. The private property of an executor or trustee cannot be taken away from him by vague suspicions or conjectures. Land cannot be impressed with a trust upon lame, unwarranted, or inconclusive presumptions. (1 Perry on Trusts, § 137.) In *Philpot* v. *Penn*, 91 Mo. 43, the court says: "It has been repeatedly held by this court that the *onus* of establishing a resulting trust rests upon him who seeks its enforcement, and where it is sought to establish such a trust by parol evidence, it must, to warrant a decree, be so clear, definite, and certain as to leave no reasonable ground for doubt." The same certainty, your honors will observe, as is required to convict of crime. To the same effect are the following authorities: *Railsback* v. *Williamson*, 88 Ill. 497; *Shepard* v. *Pratt*, 32 Iowa, 296; *Childs* v. *Griswold*, 19 Iowa, 362; *Stall* v. *Cincinnati*, 16 Ohio St. 169; *Parmlee* v. *Sloan*, 37 Ind. 469; *Cutler* v. *Tuttle*, 19 N. J. Eq. 560; *White* v. *Sheldon*, 4 Nev. 280; *Nelson* v. *Worrall*, 20 Iowa, 469; *Cuming* v. *Robins*, 39 N. J. Eq. 46; *Clarke* v. *Quackenbos*, 27 Ill. 260; *Baker* v. *Vining*, 30 Me. 128; 50 Am. Dec. 617; *Carey* v. *Callan*, 6 B. Mon. 44; *Hyden*

v. *Hyden*, 6 Baxt. 406; *Harvey* v. *Pennypacker*, 4 Del. Ch. 445; *Witts* v. *Horney*, 59 Md. 584; *Parker* v. *Snyder*, 31 N. J. Eq. 164; *Brickell* v. *Earley*, 115 Pa. St. 473; *Malin* v. *Malin*, 1 Wend. 626; *Snelling* v. *Utterback*, 1 Bibb. 609; 4 Am. Dec. 661; *Green* v. *Dietrich*, 114 Ill. 636; *Thomas* v. *Standiford*, 49 Md. 181; *Johnson* v. *Richardson*, 44 Ark. 365; *Enos* v. *Hunter*, 9 Ill. 211. Even if it had been proved on the trial by such testimony as the law requires, that this land was partly paid for with the trust fund, and partly with the funds of Chessman, the legatees would not then be entitled to the land they claim. The most that the law would give to them or the estate in such case would be a lien upon the land for the moneys of the estate or trust fund used in its purchase or interest thereon. (2 Perry on Trusts, § 842; *Hedrick* v. *Tuckwiller*, 20 W. Va. 489.)

VII. The court below held that an executor was not entitled to any compensation for his services until there had been a final settlement of his accounts. Under our statutes an executor or administrator, in ordinary cases, must settle the estate and render his final account in one year from the date of his appointment. In such cases it may be that no compensation is earned until the final account is rendered. But in a case where an executor is also trustee for the legatees, and is required to hold and to invest trust funds for a long series of years, on interest, and where no final account can be rendered until such period has elapsed, a very different rule as to compensation should be applied. In *Baker* v. *Johnston*, 39 N. J. Eq. 493, it is held that executors are entitled to commissions as executors, and also as trustees, when, their duties as executors having ended, they take the estate as trustees, and afterwards act solely in that capacity. (See ¶ to the same effect *Pitney* v. *Everson*, 42 N. J. Eq. 361; *Blake* v. *Blake*, 30 Hun, 469.) Besides his commissions as executor he was entitled to a reasonable compensation for his services as trustee, though he has made no charge for such services. It is no trifling matter to have the care and responsibility of keeping a large sum of money invested on interest for a long period of years, and the authorities on the subject are to the effect that a trustee is entitled to reasonable compensation for such services.

VIII. The testimony shows that, as to the claims against certain parties, the executor compromised and settled with said debtors to the estate and received considerably more on each of said claims than the appraised value thereof but less than the amount due thereon. Our statute provides (Probate Practice Act, § 232, p. 332) that an executor or administrator may compound or compromise with a debtor who is unable to pay his debts, with the approval of the probate court or judge. The executor made the compromises above referred to, without first having obtained the approbation of the probate court or judge, and therefore, as we understand him, the petitioner contends that the executor should be charged with the full amount of principal and interest due on these compromised claims. It would shock the universal sense of justice to charge the executor with the worthless or uncollectible claims belonging to a testator at the time of his death. No court could be found that would charge an executor with the principal or interest due upon such claims, and it was entirely unnecessary for one legislative assembly to have enacted, as it did in section 250 of the Probate Practice Act, that "no executor or administrator is accountable for any debts due the decedent, if it appears that they remain uncollected without his fault." (See Smith's Probate Practice, 228.) Independent of any statute, executors and administrators have full authority to compromise claims, and are not liable for any damage resulting to the estate except for an injudicious use of the power. If they act with fidelity and prudence their compromises are sustained, and they are protected. (*Bacon* v. *Crandon*, 15 Pick. 79; *Nelson* v. *Cornwell*, 11 Gratt. 724; *Potter* v. *Cummings*, 18 Me. 55; *Boyd* v. *Oglesby*, 23 Gratt. 674; *Alexander* v. *Kelso*, 12 Heisk. 311; *Wilks* v. *Slaughter*, 49 Ark. 235; *Berry* v. *Parkes*, 3 Smedes & M. 625; *Chadbourn* v. *Chadbourn*, 9 Allen, 173; *Chase* v. *Bradley*, 26 Me. 531; *Wyman's Appeal*, 13 N. H. 18; *Pusey* v. *Clemson*, 9 Serg. & R. 204; *Woolfork* v. *Sullivan*, 23 Ala. 548; 58 Am. Dec. 305; *Coffin* v. *Cottle*, 4 Pick. 454; *Bean* v. *Farnam*, 6 Pick. 269; *Patten's case*, 1 Tuck. 56.) Our statute which authorizes executors and administrators to compromise claims with the approbation of the probate court does not take away the common-law right which existed prior to the

passage of the statute. (7 Am. & Eng. Ency. of Law, 286, and cases cited.) The executor had the right to compromise without obtaining leave of court, and there is no liability upon him for so doing if he shows that the compromises were for the best interests of the estate. (See Schouler on Executors and Administrators, § 298, pp. 386, 387; *Wood* v. *Tunnicliff*, 74 N. Y. 38; *Geigers* v. *Kaigler*, 9 S. C. 401.)

*B. P. Carpenter*, and *Alexander C. Botkin*, for the Petitioner, Respondent.

I. The contention that when land is partly paid for from the trust fund, and partly from the individual money of the trustee, the beneficiaries cannot impress a trust upon the property, but only a lien for the moneys of the estate used in the purchase, cannot be supported when the amount of the trust fund so employed is an aliquot part of the entire purchase price. In this case the court finds that the executor used $5,000 of the estate's funds in buying the tract of land from Child and Young, which was just one-half of the entire sum paid. Chancellor Kent says (4 Kent's Commentaries, 306): "If only part of the purchase money be paid by the third party there will be a resulting trust in his favor *pro tanto;* and the doctrine applies to a joint purchase." (*Sayre* v. *Townsends*, 15 Wend. 647; *White* v. *Carpenter*, 2 Paige, 238–41; *Hidden* v. *Jordan*, 21 Cal. 100; *Case* v. *Codding*, 38 Cal. 193.)

II. Appellants endeavor to make it appear that the time from which interest is charged is premature. This rests upon the proposition that a trustee ought to have a reasonable time to find investments. It would be absurd to apply it to a case like this, where the executor had sought and procured an order authorizing him to keep the funds deposited in certain banks of the city where he resided. It is for his failure to do this, and not for a failure to look up new opportunities for investment, that this responsibility is imposed upon him.

III. It is contended that the executor should not be charged with interest on money that he was required to keep on hand to meet monthly payments. Without pressing other considerations equally pertinent and forcible, it appears from his own testimony that he had an arrangement with Mr. Hersh-

field, whereby he kept the estate funds on open account for such purposes, and drew interest on the balances as they changed from day to day. Under this arrangement there was no reason whatever why he should not have kept the entire trust fund on deposit and drawing interest during the whole period involved.

IV. We come, now, to consider the question whether interest should be compounded in computing the amount with which the executor is chargeable. As a matter of fact, the appellant, in his reports returned to the probate court, has charged himself with compound interest with semi-annual rests, whereas the directions of the court below to the referee, which were respected in the computation, called for annual rests only. The rule of equity which here controls is that stated by the chancellor in *Brown* v. *Rickets,* 4 Johns. Ch. 303, 8 Am. Dec. 567: "It may be declared to be a principle of universal law that a tutor, curator, or trustee shall not make a profit of the trust money, and then retain the profit." The facts in proof are that the appellant had the use of the sums of money which are subjected to charges of interest, and that during this time he was himself a borrower from the Helena banks. How, then, shall the court see that "the trustee shall not make a profit of the trust money, and then retain the profit?" Clearly, by charging against him whatever he would have had to pay as interest to the banks if he had not had the use of the estate's funds. The rates are not disputed; indeed, the proof shows that the interest charged by the bank was above the rates fixed by the court; and it is a matter of common knowledge that bank loans are rarely made for longer than six months, which fixes the intervals of compounding.

V. On the question of the rate of interest chargeable against a trustee we conceive the law to be well settled. When there is simply a failure to invest he must account for what is commonly called statutory interest, meaning the rate provided by law in the absence of express contract; when there is any circumstance of malversation, or where he has mingled the money of the estate with his own, and cannot, or will not, account for the profits that belong to the *cestuis que trust* the

trustee must account for the highest current rate of interest, with at least annual rests. (Perry on Trusts, § 471, and note; *Barney* v. *Saunders*, 16 How. 537; *Hook* v. *Payne*, 14 Wall. 252–57; *Estate of Holbert*, 39 Cal. 597; *Raphael* v. *Boehm*, 11 Ves. Jr. 92; *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620; 7 Am. Dec. 507; *Spaulding* v. *Wakefield's Estate*, 53 Vt. 661; *Farwell* v. *Steen*, 46 Vt. 678; *Jennison* v. *Hapgood*, 10 Pick. 77.)

VI.    Paragraph VII of the appellant's brief is addressed to the executor's right to commissions prior to the final settlement of his accounts.    We apprehend that this is no longer an open question in Montana. (*In re Dewar's Estate*, 10 Mont. 426 et seq.)    But it is argued that the executor at an early period of the administration suffered a metamorphosis into trustee, and that in the latter capacity he is entitled to compensation.    There is no claim that the appellant was made trustee by the terms of the will, or that any dual character was created by that instrument; on the contrary, it must be assumed that his relations to the estate would terminate with his discharge by the court as executor.    The principle that controls is sufficiently stated in the authority here cited. (*Hall* v. *Hall*, 78 N. Y. 535.)

VII.    Where an executor mingles the funds of an estate with his own, and thereafter enters into investments or embarks in speculations, it will be presumed that the trust funds were used in such investments and speculations.    This presumption is confirmed where his explanations of what he has done with the trust moneys are vague, evasive, and unsatisfactory; where he is shown to have been a borrower at the time such investments were made, and by other circumstances such as are here in proof. (*Troup* v. *Rice*, 55 Miss. 278; *Crowder* v. *Shackelford*, 35 Miss. 324; *Fox* v. *Wilcocks*, 1 Binn. 194; 2 Am. Dec. 433; *Lupton* v. *White*, 15 Ves. 441; *Nixon* v. *Nixon*, 8 Dana, 5; *Weir* v. *Weir*, 3 B. Mon. 645; 39 Am. Dec. 487.)    The burden of proof is on the trustee to show the amount of his own funds invested in such speculations, or otherwise the *cestuis que trust* will take the whole.    (1 Story's Equity Jurisprudence, § 468; Perry on Trusts, § 128; *Austin* v. *Sprague Mfg. Co.*, 14 R. I. 471; *Russell* v. *Jackson*, 10 Hare, 204–14; *McLarren* v. *Brewer*, 51 Me. 402; *Seaman* v.

*Cook,* 14 Ill. 501–05; *Cannon* v. *Cooper,* 39 Miss. 784; 80 Am. Dec. 101.) The cardinal object of equity is to see that the trustee never profits by malversation of the trust funds. To insure this, the beneficiaries are permitted to make their election as to whether they will take the actual profits or interest in lieu thereof. (1 Story's Equity Jurisprudence, § 465; *Docker* v. *Somes,* 2 Mylne & K. 655; *Weir* v. *Weir,* 3 B. Mon. 645; 39 Am. Dec. 487; *Norris' Appeal,* 71 Pa. St. 106–13.)

VIII. Our statute permits the compromise of claims by executors or administrators "with the approbation of the probate court or judge." (§ 232.) There is no pretense that such approbation was secured in this case, and in its absence it devolved upon the executor to show that there had been no remissness on his part, and that the compromise was for the best interests of the estate. (*Schultz* v. *Pulver,* 11 Wend. 366; *Lowson* v. *Copeland,* 2 Brown Ch. 156; *Powell* v. *Evans,* 5 Ves. 839; *Caffrey* v. *Darby,* 6 Ves. 488; Woerner's American Law of Administration, and authorities cited in note 4.)

HARWOOD, J.—This proceeding was instituted in the probate department of the district court of Lewis and Clarke county, by Martha P. Ricker, petitioner, on behalf of Jesse C. Ricker, a minor heir and legatee of Joshua C. Ricker, deceased, to require an account, under the provisions of the Probate Practice Act, sections 254–70, from W. A. Chessman, executor of said estate, touching his administration, and disbursement of the property thereof.

It appears from the record that Joshua C. Ricker died on the 1st of June, 1875, a resident of Lewis and Clarke county, Montana, leaving a widow, Martha P., and four minor children; and an estate, consisting of money deposited in certain banks, to the amount of about $18,000, which, together with other assets, consisting of certain personal effects, and demands owing the estate, and an undivided partnership interest with M. A. Price in two ranches and certain cattle, etc., altogether amounted to the appraised value of $34,467.55, excluding the homestead. The management and disposition of this estate was directed by the last will and testament of decedent, whereof William A. Chessman was appointed executor.

By said will the testator devised to his wife, Martha P., the homestead and household furniture situate in the city of Helena, Montana, valued at $3,235; and directed the executor to pay out of the funds of said estate, to said widow, for the support of herself, and the support and education of said minor children, the sum of $200 monthly, for the period of five years, and thereafter, the sum of $250, monthly; providing, however, that as each of said minor children reached the age of majority, and received a share of said estate, respectively, as provided in the will, then such monthly allowance should be diminished to the extent of such child's proportion thereof.

The will further directed the executor, at such time, and for such prices, as he deemed for the best interest of the estate, to sell and convert into money all the effects of said estate; and that all such funds not otherwise required to be paid out, as provided by the will, be, as soon as practicable, invested in United States government securities, and that the interest accruing on such securities, save such part thereof as might be necessary to carry out the provisions of the will, be, from time to time, invested in like manner.

It appears from the first annual report by the executor, returned to the probate court, at the close of the first year of said administration, that the available funds of said estate, then on hand, after paying said monthly allowance for the widow and minor children, other current expenses, and certain debts of the estate and of said partnership estate, was $15,174.26. And thereafter, from year to year, the funds of said estate, with additional receipts from sales of property, collections of debts due the estate, and accumulations by way of interest on the funds on hand, ranged from the sum last stated upward to $19,818.43, which was the largest sum on hand at the close of any fiscal year during the administration, after meeting demands thereon by way of annuities, debts, and expenses of the estate, and of the partnership estate aforesaid, as shown by the annual reports returned and approved by the court. When the partnership affairs were closed out in 1883, and the estate received therefrom $4,350, the funds of the estate reached said sum of $19,818.43, as shown by the eighth annual report, returned that year, and approved by the probate

court. The next annual report, returned in 1884, shows a balance of $18,425 on hand. Out of this sum, in addition to other demands, there was paid to the eldest child, March 5, 1885, the sum of $4,534, on her arriving at the age of majority. The annual report for the year 1885, after such payment, shows a balance of $11,980. Thereafter, the annual reports show that the funds of said estate declined in amount, from year to year, by disbursement of annuities, current expenses, and the payment of two additional legacies to the second and third of said minor children, respectively, as they arrived at adult age; until 1891, when, as the report for that year shows, the funds of said estate were practically exhausted.

The funds of said estate were not invested in government securities, as directed by the testator in the will. The circumstances which are claimed to have justified the court in ordering a departure from the provision of the will in that respect, as disclosed by the record, appear to be as follows: That the investment of the funds in United States government securities at the time in question would have required the payment of about $3,000 premium; that said premium would, of course, have reduced the funds of the estate by that amount; and that with such reduction of the fund, the annual income from investment of the remainder in government securities would, according to the testimony, have been at the rate of five per cent interest during the first part of the administration, which rate was reduced to four per cent during the latter part of that period; but considering the sacrifice of premium, the rate of interest derived from said investment would have been, on the whole, about three and one-half per cent; that the income thus obtainable, as was plain, would fall far short of sufficient to meet the required annuities and other demands upon the funds of said estate; that from these conditions, apparent at the beginning of the administration, as well as at all times thereafter, it was manifest that to carry out the provisions of the will, requiring such funds to be placed in government securities, and only the interest derived therefrom used, as was evidently contemplated by the testator, and at the same time carry out the other provisions of the will as to the maintenance of the family, was impossible; because, the amount required for

the maintenance of the family alone was $2,400 per year, in monthly installments, for the first five years, and thereafter $3,000 per year, in monthly installments, for four and one-half years, until the eldest child became of age, which would require, during the first nine and one-half years of the administration, the payment of $25,500 for maintenance of the widow and children; and if this had been the only demand on the funds of said estate, it was manifestly impossible to put the estate *funds, available at any time, into government securities,* and leave the same in such investment, and make those payments; that if the funds of the estate had been invested in government securities it would have been necessary for the executor to sell and convert into money, from time to time, sufficient thereof to raise funds, in addition to the income, to pay the annuities and other demands on said estate.   That therefore it appeared impossible for the executor, or any person charged with the execution of said will, to carry out the provisions thereof, and that to attempt such procedure would have been inexpedient, in view of the necessities of the family.

In view of these conditions, as appears from the record, soon after the return of the appraisement and inventory, on July 21, 1875, an application was presented to the probate court having jurisdiction of said estate, setting forth that the funds thereof, as shown by the inventory and appraisement, amounting to about $18,000, were on deposit in the First National Bank, People's National Bank, and L. H. Hershfield & Brothers' Bank, of the city of Helena, respectively, where the decedent had deposited the same in his lifetime, drawing interest at the rate of twelve per cent per annum; and asking the court to make an order "directing said money to remain in said banks, respectively, on interest, during the term of the administration of said estate, or at the option of said executor, during said term."   Whereupon, the court, after consideration of said application, made an order, "that the request of said petitioner be granted; that the deposits on time of such moneys of said estate, drawing interest for the estate, in such banks, be, and is, hereby approved."

Thereafter, the administration of the executor proceeded from year to year during the course of sixteen years, with annual

accounts returned into court, verified by the affidavit of the executor, showing in detail receipts and disbursements in respect to said estate. Such accounts appear to have been considered and approved by the probate court, as provided in the Probate Practice Act, sections 260–70. But in this proceeding those accounts were all opened to any question which the petitioner desired to raise against them. (Probate Practice Act, § 269.) Under this privilege a large number of specifications were formulated and filed in this proceeding, contesting the correctness and good faith of said accounts. The evidence shows, however, that there was no attempt to sustain these charges by proof, with but one exception, and that was in respect to an item of $400, credited in one of the executor's annual accounts, for money claimed to have been paid out, on behalf of the estate, to a person employed at the partnership ranch of testator and said M. A. Price, as housekeeper. In this single attack upon the integrity of the executor's accounts the court below found against the accusation, and the evidence, as reported in the record, appears to be overwhelmingly in favor of the executor. So that, as a result of opening to the assaults of petitioner the sixteen annual accounts returned from time to time by the executor, and approved by the probate court, such accounts appear to stand unimpeached in every item. These accounts are in the record before us, and, after approval by the court, are by statute made evidence of their showing, subject, however, to be impeached on being opened to contest. (Probate Practice Act, § 269.) But after passing through such contest, without any disparagement, such accountings must, with more force, be considered as evidence of the showing therein made. Therefore, the result of the management of said estate by the executor herein set down is taken from said accounts; wherefrom it appears that during said period the executor accounted for $56,369.98, derived from said estate, including accumulations by way of interest on the funds on hand from time to time. Out of this, it is claimed by the executor, and not disputed, he paid to the widow and minor children, and to the three children first arriving at the age of majority, annuities and legacies amounting to $45,288.51; and that the liabilities of the estate, as shown by the annual reports

and accounts approved by the probate court, consumed the rest of the funds of said estate.

The increase of said estate during administration, shown in this result, was largely by way of interest on the funds on hand from year to year. From this source the increase appears to have amounted to between $14,000 and $15,000. The interest is returned in gross sums in the annual accounts, but the rate, according to the testimony of a witness called as an expert accountant to investigate said annual accounts, amounts to 7 9-10 per cent per annum compound, upon the funds on hand from year to year, on the average, for the whole period of administration. These results are not controverted by the petitioner, except as to the one item of $400, above mentioned, wherein the executor's account was sustained on the proof.

Notwithstanding these results, the court found and adjudged, in this proceeding, that, in addition to the amount so accounted for, the executor ought, equitably, to account to the heirs of said estate for the further sum of $51,000, and upwards ($51,684.73), on the 1st of June, 1891; and also for an undivided one-half interest in a certain tract of land in the city of Helena, the value of which is not specifically shown, but from the testimony in the record appears to be of large value. From this judgment, and the order of the court over-ruling the executor's motion for new trial, this appeal is prosecuted.

In the review of the case here it is not proposed to enter upon an inquiry as to the legality of said order of the probate court of July 25, 1875, authorizing the executor to keep said funds in banks, at interest, instead of converting the same into government securities; nor as to what additional responsibility for the safety of such funds not so invested the executor and his bondsmen may have assumed, by reason of such departure from the will; because neither party has drawn into consideration any such questions, as affecting the determination of this proceeding. Said order of the court, allowing such departure from the letter of the will, is only pertinent to this proceeding as part of the history of said administration. The executor would not be heard to question the legality of that order, or allowed now to depart therefrom, to the detriment of said

estate, nor has he sought any such position. And the petitioner, for obvious reasons, does not desire an accounting to proceed on the basis of the result which would have been obtained by investing in government securities, instead of accepting and retaining, along with the other heirs and legatees, the larger rate of interest acquired and paid over by the course pursued. Nor is it pretended that any loss whatever happened to the principal fund by reason of departure from the will. We observe, however, the court below took occasion to animadvert upon that proceeding, in strong terms of condemnation of the executor, for procuring such order from the court, and appears to regard it in some measure as ground for finding that the executor ought to be removed. Thus the action of the executor in that regard has been brought in question as bearing upon his good faith in making application for such order. Whatever additional responsibility for the safety of said fund may have been assumed by the executor in that matter, and whatever questions as to the legality of such departure from the direction of the will in that particular might be raised, if pertinent, we think the circumstances under which that course was adopted—the fact that it was decided upon to avoid foreseen sacrifice of thousands of dollars out of the limited funds of said estate, and according to undisputed testimony, after consultation and approval by the widow, the only legatee then of mature age, and upon advice of able counsel, affirming the legality thereof, and sanctioned by the order of the probate court, with the final return of interest to the beneficiaries in double the amount which could have been obtained from an investment, as directed by the will—repels all attempted condemnation of the motive which prompted the executor to that course.

We therefore pass to the questions demanding determination in this case, which have been found entirely sufficient for our most patient and painstaking consideration.

In proceeding with the consideration of these questions, and the law and authorities applicable, it must be borne in mind that in the case at bar the trustee has admittedly, at all times since he became executor, in respect to this estate, punctually, and as required by the conditions of the will, accounted for all

of the principal fund of the estate which came into his hands, together with interest on such funds from year to year, as the same remained in his keeping, at rates which, according to the testimony, equaled, on the whole, 7 9–10 per cent compound.

These results are admitted. The trial court, in treating the propositions involved in this case, "granted, that as a result more profit and gain inured to the widow and children than the testator contemplated when he made the will." So counsel for petitioner, in treating this appeal, in their brief, say: "As a matter of fact, the appellant, in his reports returned to the probate court, has charged himself with compound interest, with semi-annual rests, whereas, the directions of the court below to the referee, which were respected in the computation, called for annual rests only."

It is therefore apparent that there is no contention that this executor has failed to account for all the property and funds committed to his charge, together with interest on the funds, at the rates mentioned. But it is contended that he should be required to pay a higher rate of interest than he has returned on such part of the estate funds as were, from time to time, in his hands, not deposited in bank at interest, as provided by said order of court. That demand is the only basis of claim made against the executor in this proceeding, and thereon rests said judgment for the recovery of money, as well as the decree impressing a trust in favor of the heirs in certain lands of the executor, as aforesaid.

1. With this premise, it is first to be inquired whether the law warrants the court in declaring a trust interest in lands of the executor in favor of the heirs, upon the proposition that at a certain time he paid, in the purchase thereof, moneys in his hands belonging to the estate.

It is found in this case that at a certain time in 1882 the executor, in the course of his private transactions, bargained to purchase from Child & Young a tract of land in the city of Helena, Montana, for the agreed price of $10,000, paying at the time of the bargain the sum of $2,000, and obliging himself in the transaction to pay, at a certain date the following year, the balance of $8,000, whereupon a deed was to be delivered by the vendors, conveying said land to the purchaser; that in

the final consummation of such purchase in 1883 the executor made use of $5,000 of said estate funds.  This is disputed, and the finding is excepted to as not sustained by proof.  But we pass over this dispute, and consider the fact as found, together with the other facts existing in the case.  It also appears, without dispute, as above shown, that the executor has long since, and without any delinquency, accounted, as fast as the terms of the will directed, to the legatees for said $5,000, which is claimed to have been paid in the purchase of said land, with interest thereon at the rate of 7 9-10 per cent compound.

Thus, the heirs have long since received and used said sum, with the interest returned thereon.  And so granting that said sum of money has been traced into the purchase of said land, it has also been traced out of, and beyond, said land into the hands of the legatees in the execution of the trust.  Still it is insisted that the heirs of said estate are entitled to a half interest in said land.

This involves a peculiar situation.  It plainly requires the trustee to carry an interest in the land, for the benefit of the heirs, for years after they have admittedly been paid, not only all the principal of the trust fund, which is claimed to have been paid into the purchase of said land, but interest thereon. This would seem to be allowing one to reap where he had not sown, and left the seed to the harvest.  At least it would be allowing the *cestuis que trust* to have and use the trust funds, with interest thereon at the rate paid, for his maintenance, and at the same time require the trustee to carry an estate in the land in question, for the benefit of the heir, without any of his funds remaining in said land.

It has already been pointed out that the only ground of demand against the executor is, that he ought to pay additional interest on such of the funds of the estate as were not kept deposited, at interest, in the banks, as will be more fully explained hereafter.  By computing compound interest on such funds, at a higher rate than the executor returned, a claim arises against him for a certain sum over and above the amount he has accounted for.

Now, counsel for petitioner insist, that when this sum arising from such compound interest equals the amount paid

in the purchase of a certain tract of land, by appellant, during said administration, the heir has a right to take the land, at the purchase price, in lieu of an equal amount of the claim for interest against the executor. This is the position taken by counsel for petitioner, in responding to the appeal by the executor; and also in the appeal by petitioner (which is consolidated with this), wherein petitioner's counsel urge their exception to the ruling of the court in refusing to decree a trust in favor of the heirs, as to the whole tract of land above mentioned; and refusing also to declare a like trust interest, in favor of the heirs, in certain other tracts of land held by the executor. But the court impressed a trust upon lands of the executor only in the one case above mentioned, where it was found that in 1883 the executor had used, in the purchase of said piece of land, estate funds equal to one-half the purchase price; but which sum the executor had afterwards accounted for, with interest as aforesaid, without delinquency, in compliance with the terms of the will. He must, therefore, not only have accounted for said $5,000, which is claimed to have been paid in the purchase of said tract of land, but for a large amount of interest thereon, as it is not disputed that he returned 7 9-10 per cent annually, until such funds were entirely paid over to the heirs.

To impress upon lands of the trustee a trust in favor of the beneficiary, under these circumstances, would be allowing him, not only the advantage of compound interest, at rates determined on by the court, but would permit him to collect such interest, by selecting lands out of the trustee's estate, purchased during the continuance of the trust, at the purchase price paid therefor years before. It would not only give the heirs the advantage of compounding interest against the trustee, for having temporarily used trust funds, in order to draw away from him the profit of such use, but would also give them the further advantage of increasing that exaction, by whatever rate the property so selected might vouchsafe, whether it be thirty, sixty, an hundred, or a thousand fold.

Counsel for the petitioner undertake to sustain the decree of the court declaring said trust in the lands of the executor, and their contention that the court ought to have gone further,

and decreed to the heirs additional trust interests in the lands of the executor, by invoking the doctrine of equity, that the trustee shall not be permitted to make any profit by the use of trust funds.   While this is a salutary rule of equity, and must be upheld, it does not warrant the court in transferring to the heirs lands of the executor, or interests therein, under the facts existing in the case at bar. . We think this is abundantly shown from the foregoing examination.    But that doctrine has been asserted with such confidence as sufficient to support the decree of the court declaring the trust, we will briefly examine the question from that particular point of view.

The question then is, if a trustee use trust funds, to the extent of half the purchase price of a tract of land, but afterwards, in the execution of the trust, accounts for the fund so used, with compound interest at the rate of 7 9-10 per cent, has the trustee profited by this transaction to the extent of half the value of such tract of land?

Suppose a man purchases a tract of land at the price of $10,000, and, not having funds at hand to pay the whole price at the time stipulated, he calls upon another having money on hand, who supplies the purchaser with $5,000, and the transaction thus stands for a time, until such $5,000 is called for, when the purchaser promptly returns the same, with compound interest at the rate of 7 9-10 per cent per annum.   Now, suppose some years after such payment, the party giving such accommodation, pointing to said tract of land, then of the value of $50,000, and, relating the circumstances just narrated, insists that such purchaser is beholden to him to the extent of half said tract of land, at its present value, together with half of the issues and profits from said land, since its purchase—in other words, that the purchaser had actually profited by such accommodation, to the extent of one-half the value of said land, and half the issues and profits thereof since purchase—although the purchaser had long since repaid the loan with interest.   This would, we think, strike practical men as an extraordinary proposition.    But we have drawn into this illustration material facts which harmonize with those existing in the case at bar, except that in the illustration it was a voluntary accommodation and in the present

case trust funds were used, but we are simply inquiring now as to the measure of profit flowing from one to the other by such use of funds.

Then, if the profits of such accommodation were to be taken away from the purchaser, and transferred to the other, applying the theory proceeded upon in this case, it would require the transfer of a half interest in the land, and half the issues and profits since the purchase, less $5,000, dropped from the account of issues and profits, to offset the $5,000 which the purchaser had returned to the lender, making no account, however, of the interest which the purchaser paid for the use of said loan.   And, on this theory of accounting for profits, the one whose $5,000 was thus temporarily used would find that he had first received back his $5,000, on demand, with compound interest; and thereafter, although the purchaser had carried the investment in the land as his own burden alone, until it is of great value, half of the land, worth $25,000, and also half of the issues and profits, less $5,000, had been handed over, merely to take away the alleged profit of the temporary use of said $5,000.

The only difference between the illustration and the accounting pursued in the case at bar is, that in the illustration it was a voluntary accommodation; and also in the account with appellant, the $5,000, dropped to offset a half interest in the land, accrued by way of compound interest, computed at higher rates than the executor had returned prior to the date of the purchase of said Child & Young tract of land.   This does not materially change the application of the illustration.

But aside from the other untenable conditions already observed, the fact just mentioned, that the money upon which this trust is proposed to be declared is not, in reality, for part of the trust money found in said land from the time of purchase, but is a demand for interest accruing on moneys which were never even in said land would seem, in view of the authorities, to be sufficient to defeat all claim to a resulting or constructive trust in favor of the heirs in the present case.   In order to sustain such a trust, on the ground that the land was purchased with trust funds, which were otherwise to be accounted for, the trust interest in the land must be founded on trust money

paid in the purchase thereof, and other demands cannot be off-set for an interest in the land. (*Ducie* v. *Ford*, 138 U. S. 587, and cases cited; *Muller* v. *Buyck*, 12 Mont. 354.) There is some question made in the authorities whether a trust ought to be declared in such a case where only a moiety of the pur-chase price was paid ¦by trust funds or whether a lien only should be fastened upon the land to secure reimbursement of the trust fund. Mr. Story seems to approve the latter course, as the more equitable and reasonable procedure. (2 Story's Equity Jurisprudence, §§ 1211, 1277 *g*. See also Perry on Trusts, § 128; *Munro* v. *Collins*, 95 Mo. 33.) If it appeared in this instance that the trust money had carried the burden of half the investment in said land from the time of purchase until the trust was declared it might then be necessary to decide between the distinctions just mentioned. But such is not the case here. The claim or money upon which the trust in the land is declared in favor of the heirs in this case arises for compound interest at a higher rate than the trustee returned. And when the date of the purchase from Child & Young is reached, in casting the interest account, $5,000 of the claim thus accruing for interest prior to that date is dropped to off-set the amount constituting half the purchase price.

On the other hand, if it is proposed to claim an interest in said land for interest on the fund which was put into the land the difficulties of the problem are still further augmented. By that theory compound interest would be required from the trustee *for the use of the money* put into the land, and the *cestui* would be allowed on this very demand for compound interest (which is supposed to constitute the profit derived from the use of the trust money) to go back and take the land also, ·with its issues and profits from the time of purchase in pay-ment of the interest. This would be recompensing the *cestui* for the use of his trust money: 1. By way of compound inter-est; and 2. By way of transferring to him the land, and the rents, issues, and profits of the land, besides compound interest.

Counsel for respondent urge, to support the judgment, that "the beneficiaries are permitted to make their election as to whether they will take the actual profits, or interest in lieu

thereof." It plainly appears that the court below allowed them to elect, and take both ways.

We have no doubt that with a closer investigation of these conditions, and more mature consideration of the authorities, the learned judge of the trial court would have denied the claims put forth that a resulting trust could arise in favor of the heirs, under the conditions shown in this case. For it cannot be sustained by the application of appropriate. principles of equity, or by reason, or precedent.

2. As to the executor's commission: And herein the question to be determined is, whether or not an executor or administrator, where the conditions require the continuance of the administration over a period of years, can lawfully be allowed, at the close of each year, on the annual account, the commission provided by statute for the executor or administrator, on moneys of the estate actually disbursed during the preceding year, by way of compensation for the care and management of the estate.

That the executor in this case, in rendering his annual account, at the close of each year, charged the estate with the commission allowed by law on funds of the estate actually disbursed during the preceding year is not disputed. And this was approved, from time to time, by the probate court. In the present accounting the court below caused these commissions to be taken away from the executor; and not only so, but required him to pay interest on the amount of commission from the date of each allowance. The interest amounts to considerable more than all the commissions, and altogether, through that ruling, the executor is adjudged indebted to the estate in the sum of $5,806.86. To support the ruling of the court below, the case of *Estate of Dewar*, 10 Mont. 426, is cited. That case is far from supporting the ruling here under consideration. It seems remarkable that the court below, having before it such a clear and painstaking elucidation of the subject of commissions, and the construction of the statute providing therefor, as found in that case should have so shaped a ruling, as we find it in the case at bar, in this particular. In this case the executor, at the close of the year, charged commission for disbursements of the past year. He was thus

charging for services passed and finally completed. In the Dewar case it is said: "It is the law, that appellant's claim for fees being unsettled, unallowed, and inchoate, and the creature of the statute, it fell with the law creating it." Here, in the case at bar, the commissions taken away from the executor were *settled, allowed,* and approved by the court, for past services. Whereas, in the Dewar case, the administrator sought to·charge commissions at the commencement, under the law as then existing, for all the period of the administration, ignoring all changes in the law, by act of the legislature, during said period. In the Dewar case the court further observed: "Appellant does not separate his services as to these two. periods, and claim compensation upon services rendered in the three and a half months' period under the old law, and upon those rendered in the nineteen months' period under the amendment. If he did so, and claimed a higher percentage upon services fully performed and passed during the three and a half months' period, the argument of vested right would address itself to us with some force. (*People* v. *Pyper*, 6 Utah, 160.)"

It appears that in the course of the executor's administration, in the present case, the legislature reduced the rate of commissions, and the executor's commission was conformed to the change, as shown by indorsement on the fourth annual report of the executor by Judge Hedges. Thereby the learned judge applied the construction of the law as approved several years later in the case of *Dewar's Estate,* 10 Mont. 426. The ruling of the district court in this particular cannot be sustained.

3. What rate of interest should be required from the executor on funds to the credit of the estate not deposited in bank at interest, in view of the facts involved in this case? and further, as to the question of compounding interest in accounting with trustees.

As we proceed in the consideration of these questions we shall also digress sufficiently to consider an exception, on behalf of petitioner, to the ruling of the court in refusing to charge the executor the full amount of a certain debt, and interest owing said estate, where the executor had accepted, by way of compromise, and reported to the court, a less amount in settlement.

It appears that of the funds of said estate on hand at the death of the testator, some $6,000 was on deposit in the People's National Bank, then a banking institution in the city of Helena; that in 1878 said deposit amounted to $6,500; that said bank became insolvent, and went into the hands of a receiver about July or August of that year, and, on winding up its affairs, claimants against said bank received only 55 per cent of their demands; that about February or March prior to said failure the executor, having come into possession of information concerning said bank, which led him to doubt the safety of the estate funds therein, sought to draw such funds out, but the officers in charge of said bank refused to cash the certificate of deposit, claiming that it was a time deposit, and the sum was not demandable until maturity of the certificate at a later date; that the executor, however, insisted on drawing out such funds, and being at the time personally indebted to said bank for loans obtained therefrom in the sum of about $6,500, for which the bank held his individual note, the executor, in order to get the funds of the estate out of said bank, for the reason aforesaid, offset said certificate of deposit for the credit of the amount thereof on his note of individual indebtedness to said bank, and assumed the indebtedness of said bank to the estate for the amount of said certificate of deposit, namely, $6,500. This transaction substituted the executor as debtor to said estate in the sum of $6,500, in place of his indebtedness to said bank, for money theretofore borrowed and used in his affairs.

From this time on, during said administration, it appears there were moneys to the credit of said estate not deposited at interest in bank, as provided by the order of court, but interest was returned thereon, as above shown. The executor testified that he returned interest every year on all moneys to the credit of the estate, not deposited in bank at interest, at rates as high as the banks paid on deposits, and at no time less than 8 per cent, even after the banks reduced the rate below 8 per cent. This testimony is not inconsistent with the other facts shown; for, from the testimony of the bankers called in the hearing, it appears that the rate of interest paid by the banks on time deposits was reduced below 8 per cent about

the year 1883, and so continued thenceforward. This may account for the fact that on the whole the interest returned on the estate funds falls a fraction below 8 per cent. The rate of interest paid by the banks during said administration appears to have varied from 12 per cent on a descending scale to 6 per cent. The rate of 12 per cent prevailed for only a brief period after said estate came into the hands of the executor, when it was reduced to 10 per cent, which rate was allowed until about the year 1880, when 8 per cent was fixed upon, and prevailed until 1883; in 1883 and 1884 seven per cent was allowed, and thereafter 6 per cent.

In addition to the substitution of the executor as debtor to the estate in place of the People's National Bank for said $6,500, he charged himself with $1,500, in favor of the estate, under the following circumstances: It appears a debt was owing the estate in the sum of $1,950, by Guthrie & Norris, bearing interest at 2 per cent per month, and another debt owing by the same Guthrie, in the sum of $3,000, bearing interest at 1 1-8 per cent per month, through transactions had between the decedent and said debtors; that after the estate came into the charge of the executor, said debtors were unable to make payment, and their property affairs were not in such condition that payment could be enforced. The executor says in his testimony, that, under the circumstances, he thought it best to "nurse the matter along," and try to get payments from time to time, which it appears he did, and succeeded, in the course of time, in getting payments of principal and interest, altogether amounting to $5,225.98 on said $3,000 note; and payments of principal and interest on the $1,950 note, amounting to $3,137.12. It appears the debtors, for a time, conducted a butcher business, and considerable of said collections was obtained by the executor taking supplies from them for his household, and also for Mrs. Ricker and her family, and crediting the amount due for such supplies on said notes. But as the time approached when the eldest child arrived at the age of majority, and required her distributive share of the estate, as provided in the will, there was more than $1,500 of principal and interest together due on said debts; and in the mean time Norris, as the evidence shows, had failed altogether

financially. This balance the executor agreed to compromise
with Guthrie—the only one of the debtors from whom there
was any prospect of obtaining payment—at $1,500, if he would
then raise and pay that amount, so that the executor could
ascertain what amount of such collection could be counted on
for such distribution. Guthrie testified in this hearing that
he endeavored to raise said sum agreed upon as a compromise
of said debt, but could not; that he then arranged with the
executor to assume said sum as paid, and credit the estate there-
with, promising to pay said sum shortly thereafter; that the
executor made such credit accordingly, and thereby put to the
credit of said estate $1,500 which he had not actually collected,
and of which, according to the evidence, the executor never
received more than $700 from said debtors. Yet the executor
accounted for said $1,500, as collected, with interest thereon,
along with the other funds, as heretofore shown.

The petitioner, in his appeal, insists, notwithstanding these
facts, that the executor should be charged with the amount he
rebated from said claim by way of compromise. This demand
is based upon the showing from the public records of Lewis
and Clarke county, that in March, 1880, there was conveyed
to said Guthrie and John H. Ming, jointly, for a consideration
of $2,400, stated in the deed, "the south half of the south half
of the northwest quarter of section 29, township 10 north,
range 3 west, less four acres"; that the title to said property
so remained until April, 1883, when, it appears from the record,
Guthrie executed a mortgage of his interest to said Ming, to
secure the sum of $6,000, and that in December, 1883, as
shown by such record, Guthrie divested himself of the legal
title to one-half interest in said land by absolute conveyance,
for a stated consideration of $5,500.

From this showing of the record the petitioner contends
that it appears said claim could have been enforced in full
from Guthrie, by seizure of said land, and, therefore, the
executor should be charged the full amount of said claim and
interest for failing to make such seizure.

The executor testifies that during all the time said indebted-
ness of Guthrie & Norris was owing to the estate said debtors
were insolvent, according to the information gained by the

executor, on diligent inquiry; that he did not bring suit against them, for the reason that he thought it more prudent to proceed as aforesaid in trying to collect said debts; that, in his view, to attempt to enforce payment by suit might have driven the debtors into such a condition that they could pay nothing, while by the course the executor pursued he was obtaining some payments. The executor also answered in his testimony that he could not say positively whether he searched the records to find whether the debtors had real estate, or interests therein, subject to attachment.

The testimony of Mr. Hershfield, a banker, is also to the effect that during all the time in question claims against said debtors were not considered good; that their paper was not negotiable, and they were not regarded as financially responsible.

We think the court, under the circumstances shown, justly refused to charge the executor any more than he had returned, on account of said demands against Guthrie & Norris. The mere fact that the legal title to a piece of land comes into the name of an individual is not conclusive evidence that such property is subject to execution against such individual. (*Vaughn* v. *Schmalsle*, 10 Mont. 186.) Nor is the record of such transaction, in relation to a piece of real estate, evidence that the amount set down in the conveyances represents the value thereof. Such proof alone, without showing the real value of the land, scarcely rises to any showing inconsistent with the testimony of the other witnesses, to the effect that said debts were not enforceable because of the insolvency of the debtors. Guthrie says, in his testimony, that he does not think a judgment could have been enforced against him, and he appears to have been the most responsible, as well as the most active, of the two debtors in trying to pay said debts.

It is our opinion that the court below not only was justified in refusing to charge the executor with any more than he had returned on account of said claims against Guthrie & Norris, but the court should have also refused to require the executor to pay further interest on said $1,500, inasmuch as it was clearly shown that in giving credit therefor, before the actual collection of that amount, the executor involved himself in a

personal loss of $800, besides having returned interest on said $1,500, from the time it was so credited to the estate, as above shown.

Regarding the rate of interest which ought to be imposed on the executor, the court below so ordered the accounting, that he should be required to pay compound interest on all funds to the credit of the estate, not deposited at interest in bank, at the rates of 18, 15, and 12 per cent per annum compound, during stated periods of the administration. The sum so accruing by those rates was compounded by annual rests to carry the interest over as principal. The rates required are, according to the evidence, near the maximum rates shown to have been obtainable on loans by banks, during the periods stated, there being no restriction by law on the rate of interest which might be agreed upon between borrower and lender. The legal rate provided by statute, enforceable on demands, in the absence of an agreed rate, during the same period, was, and still is, 10 per cent per annum. The statute in force since 1872 on this subject reads as follows: "Creditors shall be allowed to collect and receive interest, when there is no agreement as to the rate thereof, at the rate of 10 per cent per annum for all moneys after they become due, on any bond, bill, promissory note, or any other instrument of writing, and on any judgment rendered before any court or magistrate authorized to enter up the same, within the territory, from the day of entering up such judgment until satisfaction of the same be made; likewise on money lent, or money due on the settling of accounts, from the day of such settlement of accounts between the parties and ascertaining the balance due; on money received to the use of another, and retained without the owner's knowledge, and on money withheld by an unreasonable and vexatious delay." (Comp. Stats., div. 5, § 1237.)

We have been unable to find authority to support the proposition that a court has jurisdiction to impose arbitrary rates of interest above the statutory rate, in an equitable accounting with a trustee, although courts of equity frequently require a lower rate in such accountings, as an equitable rate.

In England there appears to have been a rule of equity requiring what is called an *equitable* rate of interest, in account-

ing with trustees; and this rate is uniformly lower than the *legal* rate. The legal rate there being 5 per cent, equity usually required 4 per cent in such accountings, under the name of "equitable interest in mitigation of legal rates." (Fonblanque's Equity, 443, note.) Mr. Spence, the standard English authority on Equity Jurisprudence, says: "Where it appears that the trustee or executor has improperly or unnecessarily kept balances, or any considerable portion of trust moneys in his hands, he will be charged with interest on what he has so retained, generally at 4 per cent, but under special circumstances at 5 per cent." (2 Spence's Equitable Jurisdiction, 920.) From a passage in the opinion delivered by Lord Chancellor Brougham in 1834, in *Docker* v. *Somes,* 2 Mylne & K. 666, it appears conclusively that English courts of chancery did not feel at liberty to impose arbitrary rates of interest upon trustees, in such accountings, exceeding the legal rate.

As to the rule in the United States, Mr. Perry, in his examination of the subject, says: "In the United States there is no law by which different rates of interest can be applied to different degrees of negligence or misconduct; and the only question here is whether simple or compound interest shall be imposed." Further along, in summing up his examination, he says: "The rate established by law as the legal rate, in the absence of special arrangements," governs courts of equity in accounting with trustees in this country. (2 Perry on Trusts, § 468.)

Mr. Story expresses the same view, saying: "And the trustee, by mixing trust money with his own, at his banker's or otherwise, will become responsible for the replacing of the money, and *lawful* interest during the intervening period. . . . . So, too, when the trustee makes an improper investment of trust funds he becomes responsible for the same, with interest." (2 Story's Equity Jurisprudence, § 1277 *g*.)

The same conclusion is reached by Mr. Page in his recent research on "Executors and Administrators," found in 7 Am. & Eng. Ency. of Law, 426–29, with copious citations.

In *Schieffelin* v. *Stewart,* 1 Johns. Ch. 620, 7 Am. Dec. 507, although one of the severest cases in this country in its

exaction from the trustee, there appears to have been no thought of imposing rates higher than the legal rate of 7 per cent. (See, also, *Clarkson* v. *De Peyster*, 1 Hopk. Ch. 426.) In Cali-fornia we find it held that the legal rate of interest should not be exceeded in such accountings. (*Estate of Clark*, 53 Cal. 355; *Merrifield* v. *Longmire*, 66 Cal. 180; *In re Eschrich*, 85 Cal. 98.)

There is a passage in *Cruce* v. *Cruce*, 81 Mo. 676, relied on by respondents to sanction the requirement of interest above the rates fixed by statute; and while it may be so construed, we do not think such was intended to be held, for, in that case, only the legal rate of 10 per cent was allowed; and under the passage relied on is cited *Frost* v. *Winston*, 32 Mo. 489, where it appears the rate charged was that prescribed by law.

In the examination of a great many cases on this subject, and especially all of those cited by respondent, we fail to find any authority contradicting the text of Mr. Perry, that the legal rate is not exceeded, unless a lawful contract provides for a higher rate.

We now pass to a brief examination of the question of compounding interest in accounting with trustees.

Near the close of the last century the remedy of compounding interest in such cases appears to have come into vogue in the courts of equity of England and the United States, as a convenient and potent remedy to draw from delinquent trustees the actual or presumed profits derived from the use of trust funds; although prior to that time it appears to be acknowledged that the law was administered with great laxity in that regard.

In 1805 we find Lord Elden, in his examination of the question of compounding interest in such accountings (*Raphael* v. *Boehm*, 11 Ves. 92), so much in doubt as to the proper practice, that he postponed the consideration, to give time to make special inquiry on the subject, observing that it was a matter of great importance. And for his information, it appears he went not to reports or treatises, but caused inquiry to be made of the masters in chancery as to their understanding of the correct practice. (See, also, an examination of this subject, from an historical, as well as legal, point of view, by Lord Chan-

cellor Brougham, in *Docker* v. *Somes*, 2 Mylne & K. 655; by Chancellor Kent, in *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620, 7 Am. Dec. 507; by Chancellor Sanford, in *Clarkson* v. *De Peyster*, 1 Hopk. Ch. 426; by Mr. Justice Grier, in *Barney* v. *Saunders*, 16 How. 535; Perry on Trusts, and cases cited, under § 468; *Cruce* v. *Cruce*, 81 Mo. 676; the monograph by Mr. Page, of the Pennsylvania Bar, on "Executors and Administrators," 7 Am. & Eng. Ency. of Law, 425 et seq.; and the elaborate note to *Walls* v. *Walker*, 99 Am. Dec. 296.)

There is no doubt the doctrine has been applied during the present century, where circumstances appeared to warrant, as shown by an examination of the cases; but as to the special conditions to which it ought to be applied, and as to the rate of compound interest considered equitable, there seems to be much diversity of opinion. Sometimes the rule has been exerted with extreme rigor against a trustee guilty of fraud in respect to the trust funds, whereby he sought to enrich himself therefrom, as was done by Lord Chancellor Loughborough, in 1798, in *Raphael* v. *Boehm*, 11 Ves. 92. Of this case, Lord Chancellor Brougham says (see *Docker* v. *Somes*, 2 Mylne & K. 655), it was the strongest instance of compounding interest against a trustee in England; but it was a case where "a gross breach of trust had been committed; for the large sum of £30,000 was expressly directed to be laid out for accumulation, and the executor having thought proper to employ it in his own trade, the court ordered him to be charged with interest at 5 per cent from the time of the executor's death, with half yearly rests, and interest for the intermediate times. All the judges who have mentioned this decree have considered it severe." And he adds that, in this "most remarkable case, which indeed is always cited to be doubted, if not disapproved, the compound interest was given with a view to the culpability of the trustee's conduct, and not upon any estimate of the profits he had made by it."

As has been mentioned, the case of *Schieffelin* v. *Stewart*, before Chancellor Kent, in 1815, is considered one that applied the rule with great severity. Therein it appears the executor had retained in his hands constantly for some ten years thirty-three thousand dollars of trust funds, " without

producing any benefit or advantage to the estate"; and the chancellor approved the report of the master, charging the executor the legal rate of 7 per cent interest, with annual rests for compounding the same.   One of the cases relied on by Chancellor Kent, in support of that judgment, was *Raphael* v. *Boehm*, 11 Ves. 92, but, of course, without knowledge of the estimate in which it was held by the English bench, as appeared by later comments.   And the case of *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620; 7 Am. Dec. 507, notwithstanding the great weight of authority it carried by reason of the acknowledged learning and judicial ability of the chancellor who delivered the opinion, in its turn, seems to have been shaken by subsequent adjudications in New York, at least as to the rigor with which it applied the rule of compounding interest.  (*Clarkson* v. *De Peyster*, 1 Hopk. Ch. 426.)

Mr. Perry states, as his deduction from the authorities, that: "It is difficult to lay down any general rule that is equitable and applicable to all cases, as to the interest trustees shall pay upon trust funds in their hands.   In England, if trustees suffer money to remain in their own hands, or in the hands of third persons, or in bank for an unreasonable time, in addition to their liability for its loss during such delay they will be charged with interest at the rate of 4 per cent; but if the trustees are grossly negligent or corrupt, or improperly call in the money from a proper investment, and suffer it to lie idle, or if they use it in trade or speculation, or invest it in improper places, the court will charge them with interest at the rate of 5 per cent; and, in certain special cases of misconduct, the court will order annual or semi-annual rests, for the purpose of charging them with compound interest.   In the United States there is no law by which different rates of interest can be applied to different degrees of negligence or misconduct; and the only question here is, whether simple or compound interest shall be imposed.   The general rules, so far as they can be drawn from all the cases, are as follows: 1. If a trustee retains balances in his hands which he ought to have invested, or delays for an unreasonable time to invest, or if he mingles the money with his own, or uses it in his private business, or deposits it in bank in his own name, or in the name of the firm

of which he was a member, or neglects to settle his account for a long time, or to distribute or pay over the money when he ought to do so, he will be liable to pay simple interest at the rate established by law as the legal rate in the absence of special agreements. This rule is subject to the qualification that trustees cannot make any advantage to themselves out of the trust fund; and if they make more than legal interest, they shall pay more, as if they make usurious loans they shall be charged with all their gains from the use of the money. If the trustee cannot show what amount of interest he has received he shall be charged with legal interest from the time when the regular investment ought to have been made. There may be an exception to the rule that a deposit of the trust money in bank in the name of the trustee, or a mixing of the trust fund with his own, will impose a liability of legal interest. There must be some element of a breach of trust in the transaction, or a breach of duty." (1 Perry on Trusts, § 468.)

There are cases of comparatively recent date, however, in which compound interest has been held proper by the supreme court of one state, and refused by that of another, where the cases appear to be surrounded by quite similar circumstances. This will be seen by a comparison of *Clark's Estate*, 53 Cal. 355, *Merrifield* v. *Longmire*, 66 Cal. 180, and *In re Eschrich*, 85 Cal. 98, with the case of *Cruce* v. *Cruce*, 81 Mo. 676, where, apparently under very similar facts, the California court allowed 7 per cent, compounded by annual rests; while the supreme court of Missouri allowed only simple interest at the legal rate of 10 per cent. But in the treatment of the latter case, after referring to the fact that "the rule of exacting interest from delinquent trustees has nowhere been enforced more rigorously" than in Missouri, it was said that if the interest had been compounded by annual rests, "at the low rate of 6 per cent," it would have been allowed to pass. "But, as every case must be determined according to the facts and circumstances peculiar to it, I am satisfied," says the author of that opinion, "that it would be inequitable to order interest compounded at the high rate of 10 per cent per annum against the respondent. My reasons for this conclusion are as follows: 1. The account extends through fifteen years. The result of

the computation, like all such arithmetical results, would be surprising and excessive. It would, in my judgment, exceed what could be expected from any prudent and careful administration of the estate under ordinary circumstances. I think it would be a marvelous achievement for any trustee of ordinary skill and prudence to keep a fund of $5,000 or $6,000 so constantly and securely invested for a period of fifteen years as to produce the net result of compound interest at 10 per cent per annum. In the ordinary course of events there would necessarily be intervals of irregular length between investments, not to say any thing of possible loss and depreciation of security. The ability of investing the interest annually, as soon as collected, may well be doubted when we consider its moderate volume, and the frequency with which it would have to be put out. The exaction of compound interest at such a high rate, for so long a period of time, would, in my judgment, be a departure from the leading principle, which requires the chancellor to approximate, as near as possible, the actual or presumed gains and profits of the fund." (*Cruce* v. *Cruce*, 81 Mo. 676.)

The theory upon which the court exacted such extraordinary rates of compound interest from the executor in the case at bar was, that, according to the testimony of the bankers, money could have been loaned at the time in question at such rates. Nowhere in the record is there shown any proof as to the net result of loaning money during a given period, even by such experienced financiers as bankers, after deducting expenses and losses, in order to ascertain the net profits which could be derived from the use of money, by way of interest. Without any such inquiry, the rates of 18, 15, and 12 per cent were designated by the court, for stated periods of the administration, and the referee was directed to compute at those rates, during such periods, compounding by annual rests.

Would it not be somewhat analogous if, in a given case, it were found that a bailee of another's carriage-horse had kept and used it for the period of say five years; and in order to charge the bailee with the profits of such use the court should take proof of the price for a livery animal of like quality for one day, and without further inquiry as to expense of feeding

or care, or as to the time such animal would ordinarily lie idle, the court should order the case to a referee to cast the aggregate for the whole period at the price stated for a day, and enter judgment accordingly? If liverymen could so reckon profit their prosperity would no doubt be far different than practical experience demonstrates.

So, if loans of money were always promptly returned at maturity with the stipulated interest, and the gross rate was never diminished by loss or delay through deterioration of securities, death, disaster, or fraud, nor by the expense of constant attention to such affairs, the employment of professional services, of litigation, and so forth, even then it would not be possible in practice to make the gain compound along the line of the highest rates attainable; because in practice it would not be possible to reloan the money and the accumulated interest the instant it was due. If the debtor, through stubborn neglect or misfortune, is delinquent in payment the law must be resorted to, and for such delay it will not require from the delinquent debtor compound interest; so that in demanding return of compound interest at the loaning rate in such instances (which are not infrequent in experience) the law would demand on the one hand of the trustee what it would not allow him to collect on the other.

The problem of compound interest, when set in motion, moves on for its allotted period with the certainty of time and mathematics. All other conditions are assumed. It considers no delay, no failure, no expense—its assumed creditors, forever, with the regularity of perpetual motion, obey an assumed demand—and the gain in turn is presumed to be reloaned the instant of its payment. The problem contemplates constant accretion by a composite process, but no diminution; it omits no farthing, nor allows any to escape when gathered—not even so much as the expense of postage, or the wear of shoe-leather, to make a demand. The thriftiest management and most fortunate consummation in practice cannot hope to reach the quotient gathered by the problem, in the long run, unless odds are given in fixing the rate to be compounded, to offset the expenses, delays, and failures met with in practical experience. But with allowance for such contingencies in fix-

ing such rate, no doubt common experience will admit that it is practical to gain compound interest; and it has been, no doubt justly, held equitable in accounting with trustees, where they have in their hands moneys for accumulation, or which was made to accumulate, or has been used for the trustee's profit, to require compound interest. But the rate must be fixed with due consideration, or the result will be found out of all proportion to what could have been accomplished in the field of practical affairs. We are suggesting here nothing new, for these conditions have undoubtedly been considered, if not mentioned in detail, by courts of equity, as shown in the fact that they have in general gauged their requirements accordingly. But, sometimes, as might have been expected in the application of an abstract mathematical rule, the exact relations of which, to practical results, is not easily detected, some hardship may have been worked.

There is evidence in the record to the effect, that from time to time during the period in question, banking institutions contracted to pay, for the use of funds left with them for a stated time, a certain rate of interest per annum. That is the only evidence in the record which approaches a safe criterion from which there might have been found the measure of net profits—or, in other words, the net earnings which could be counted on for the use of money by way of interest. While this testimony did not take that form of inquiry exactly, it is evidence of what money could have earned placed in such institutions, they insuring the safety thereof, so far as their own responsibility went, and bearing the expense and loss incident to its use. The tendency of this evidence, more than any other in the record, is to show what such financial institutions could afford to pay for the use of money, and insure its safety, and bear the expense and loss incurred in handling. Who are more likely to get greater profit from the use of money, under fairly safe and conservative conditions of handling, than bankers? If there are other financiers or business men who can do better is it not likely bankers would learn the way and adopt it?

But if we measure this executor's returns by that criterion a balance is found in his favor; for, when the rate in the banks

went below 8 per cent, the evidence is that he kept on returning at that rate on moneys to the credit of the estate not in bank.

If we look to the precedents in the books we find, too, that the returns of this executor, made without delinquency or any suspicion of fraud, rise above the exactions from trustees, by way of compound interest, in cases where their accounts were delinquent and conduct culpable. Shall a judgment of greater severity be pronounced in this case than in such? It appears from numerous precedents from all sections of the country, that this case would, in those courts, be dismissed; because the executor has voluntarily and promptly made returns of income double what could have been obtained by the course contemplated by the testator's will, and more than the banks would have allowed during considerable portion of the time; and more than the courts have found equitable to exact in accountings with trustees whose conduct was found grossly detrimental to the interest of the estate. This must be admitted. And even granting the worst that has been asserted against the executor, in the case at bar—the temporary use of certain of the trust funds in private affairs, which is made the occasion for exacting compound interest in several cases, as we have seen—still it appears, and is not disputed, that this executor has seen to it, that the estate in no way suffered detriment therefrom, and gained considerably thereby. If a man's foot slip, or if he stumbles, and then regathering himself walks uprightly, and delivers his burden in advance of all others, without one whit missing, shall he be turned upon, and scourged with a severity exceeding that laid upon one who refuses to proceed with the discharge of his duty altogether? It may be answered that if one who waivers is allowed to go without punishment, others will walk unsteady. This answer does not meet the situation. If he was found delinquent it would be time to consider of his punishment, but if not finding him delinquent in any respect more is exacted than for entire neglect absolute default would be encouraged by such unjust judgment.

But laying aside all figures of speech, as not much to be indulged, in judicial investigations, and viewing all phases

of this case in the plainest fashion, it appears that if heavier judgment is laid on such a case as this, the court will thereby designate the plane of its exactions much higher than any court has attempted to maintain, so far as we have been able to discover.

With the carefulest investigation of the law and facts, our deliberate judgment is drawn to a negative conclusion on every vital point in this case. There is no hardship in this, for the executor must have managed the affairs of the estate with solicitude, for the welfare of the heirs, and that his management has been largely fruitful of benefits to them is frankly admitted. Such results do not come from indifference or neglect.

In rendering the extraordinary judgment in this case we think the learned judge of the court below must, without the deliberation usually manifested, have adopted views urged by the forceful eloquence of petitioner's counsel. But things only assumed, in whatsoever eloquent phrase, or forms only painted, however real they seem at first impression, cannot support the judgment of a court.

An order will therefore be entered reversing the judgment in this proceeding, and remanding the case, with directions to enter judgment in the court below dismissing this proceeding at the cost of petitioner.

*Reversed.*

PEMBERTON, C. J., and DE WITT, J., concur.

ON REHEARING.

Per CURIAM.—Since the determination of this appeal, motion for rehearing has been presented and given careful consideration, besides allowing counsel the unusual privilege of argument, to more fully expound the grounds on which rehearing is demanded. Nevertheless, there has been no exposition of points wherein the court overlooked or erroneously applied any pertinent or controlling authorities or material facts in the original determination. On the contrary, this retrospection of the case, in the light of motion for rehearing, tends to confirm the views of the court heretofore expressed, as fully in accord with the authorities and facts, and that a

just and proper determination was reached. The same will therefore be allowed to stand as originally announced.

This motion for rehearing, however, raises a new point in the case, which hitherto was neither presented in the brief nor in the argument on appeal; nor does it appear that consideration thereof was had in the trial court—namely, that in certain years the probate court of Lewis and Clarke county, then having jurisdiction of said estate, allowed the executor a higher rate of commission by 1 per cent than the statute then provided; in other words, it is asserted that, at certain times when 5 per cent commission was allowed the executor, the statute prescribed only 4 per cent. It is obvious, this being a court of review, and not of original inquiry in these matters, it should not enter upon an investigation, or make any order, touching this question, for the reason already mentioned—that no inquiry or determination on that feature of the case appears to have been made by the trial court. Therefore, there is no order or determination of the trial court to review on that point. The trial court denied the executor all commissions, on grounds which did not touch the question of his having been allowed by the probate court a rate exceeding that provided by statute. That particular question seems not to have been adjudicated. But whatever inquiry or order concerning the readjustment of said commission, on the ground alleged, may be pertinent, it should, in the first instance, be proceeded with in the trial court. The motion for rehearing will therefore be denied.

