The administrator is forbidden to engage the assets of the estate in trade or business, even to carry on, as a going concern, the business of the decedent. For him to do so is a violation of the obligation of his trust in two particulars: his duty to wind up the estate as speedily as possible, and his duty to preserve its assets intact and unimpaired by exposure to, or loss from, the risks and hazards of business or trade. (24 *Page 452 
C.J. 55; 11 Cal. Jur. 1027; Steel v. Knox, 10 Ala. 608;Hallock v. Smith, 50 Conn. 127; Sparrow's Succession, 39 La. Ann. 696, 2 So. 501; Casner's Estate, 2 Kulp (Pa.), 474;In re Thurber's Estate, 311 Ill. 211, 142 N.E. 493; Campbell
v. Faxon, Horton Gallagher, 73 Kan. 675, 5 L.R.A. (n.s.) 1002, 85 P. 760; Schneeberger v. Frazer, 36 Idaho, 737,213 P. 568; Riedy v. Bidwell, 70 Cal.App. 552, 233 P. 995;Fleming v. Kelly, 18 Colo. App. 23, 69 P. 272; Ward v.Tinkham, 65 Mich. 695, 32 N.W. 901; In re Gianelli's Estate,146 Cal. 139, 79 P. 841.)
Further, where the personal representative makes an illegal use of the assets and real estate of the decedent by carrying on therewith a business venture, he is chargeable with the funds and personally converted to his illegal use and also with the reasonable rental value of the real estate occupied by him. (Inre Dolenty's Estate, 53 Mont. 33, 161 P. 524; In re Rose'sEstate, 80 Cal. 166, 22 P. 86; In re Alfstad's Estate,27 Wn. 175, 67 P. 593; Branner v. Michols, 61 Kan. 356,59 P. 633, at 639; 11 Cal. Jur., p. 994, sec. 631, p. 1014, sec. 646; 12 Cal. Jur. 32.) In such cases where the administrator has illegally made use of the estate assets and property for purposes other than the true object of administration he is chargeable with interest, at the legal rate, compounded annually, on the funds and property, so converted, and on the rents so charged against him. (In re Ricker's Estate, 14 Mont. 153, 29 L.R.A. 622, 35 P. 960. where this point is discussed at length; In reRodger's Estate, 68 Mont. 46, at 54, 217 P. 678; In reEakins' Estate, 64 Mont. 84, at 91, 215 P. 1115; In rePiercy's Estate, 168 Cal. 775, 145 P. 91; In re Merrifield'sEstate, 66 Cal. 180, 4 P. 1176; In re Delaney's Estate,41 Nev. 384, L.R.A. 1918D, 1022, 171 P. 383; Ward v. Tinkham,65 Mich. 695, 32 N.W. 901; In re Lux's Estate, 100 Cal. 606,35 P. 345, at 347, 639), even where the misuse was in good faith (Brown v. Ricketts, 4 Johns. Ch. (N.Y.) 303, 8 Am. Dec. 567). *Page 453 
The administrator is chargeable in any event with the amount of the estate, shown by his inventory, which comes into his possession, at the value of the appraisement, and with all the interest, profit and income of the estate, except where he claims and establishes credit therefor. (Secs. 10282 and 10283, Rev. Codes 1921; 12 Cal. Jur. 29; In re Dolenty's Estate, 53 Mont. 33,161 P. 524; In re McPhee's Estate, 156 Cal. 335,104 P. 455; In re Gianelli's Estate, 146 Cal. 139, 79 P. 841; In reRadovich's Estate, 74 Cal. 536, 5 Am. St. Rep. 466, 16 P. 321;In re Connolly's Estate (Mont.), 235 P. 408, at 419; 24 C.J. 51, 964.)
There is no provision of law in this state authorizing an administrator to sell assets of the estate, when, where and as he pleases, and for such prices as he may choose. (Secs. 10198-10204, Rev. Codes 1921.) Such sales are invalid. (Sec. 10197, Rev. Codes 1921; King v. Harford, 48 Cal.App. 405,191 P. 998; Belloc v. Rogers, 9 Cal. 123, at 127; In reDolenty's Estate, 53 Mont. 33, at 38, 161 P. 524; Farmers'Nat. Bank of Ponca City v. Cravens, 93 Okla. 58, 219 P. 138; 11 Cal. Jur. 832, and cases cited; Jones v. Wheeler,23 Okla. 771, 101 P. 1112; In re Radovich's Estate, 74 Cal. 536, 5 Am. St. Rep. 466, 16 P. 321; Warner v. Mason, 109 Okla. 13,234 P. 747; State ex rel. King v. District Court, 42 Mont. 182,111 P. 717.)
The appellants have lived within three miles of the estate ranch, and during all of the time must have known that the respondent was operating the same; when the first account of the respondent was filed, March 11, 1922, the appellants knew and yet not once during all of the time did they make any objection, nor did anyone in their behalf. This, even if the respondent had operated the ranch at a loss, would preclude the appellants from urging a personal liability on the respondent. *Page 454 
(40 L.R.A. (n.s.) 235.) French v. Davis, 38 Miss. 167, andMyrick's Succession, 38 La. Ann. 611, sustain the doctrine, "where the heirs or creditors remain silent while the executor works a plantation belonging to it, they are estopped from charging him with a resulting loss, since it was within their power in the first instance to have prevented his continuing the business."
Elizabeth Woods Jennings died intestate on June 19, 1920, a resident of Sweet Grass county, leaving estate therein. On July 12, 1920, letters of administration of her estate were issued to James G. Woods, one of her sons. The administrator, on March 11, 1922, filed an account and report, which purported to cover his administration from its commencement to February 28, 1922. The court fixed March 25, 1922, as the time for hearing the same, but on the 24th of that month Harvey L. Woods and Carrie M. Ammerman, a son and daughter of decedent, filed objections thereto. So the matter remained until August 4, 1924, when Honorable B.B. Law, Judge of the Ninth Judicial District, who had been called in for the purpose, assumed jurisdiction therein. On that day, for good reasons Judge Law halted the hearing which he had begun and ordered the administrator to file, within two weeks, an amended and supplemented account. This the administrator did on August 18 and in the new account he made report of his administration from the date of his appointment to and including August 16, 1924. Hearing thereon was set for September 2, 1924. To this account Harvey L. Woods and Carrie M. Ammerman also filed objections. On the day fixed Judge Law resumed the hearing. The administrator testified at length and offered in evidence a large number of exhibits. Testimony of other witnesses was taken. *Page 455 
Near the close of the hearing the court gave the administrator permission to file still another supplement, this for the correction of items found erroneous in the account and report filed August 18, with this admonition: "Do not change or interfere with the original account, just file a supplement, asking that certain items be corrected. Then, under my order, if I find they ought to be made, the clerk can make them. So I can keep the record straight."
At the close of the hearing counsel for the objecting heirs moved the court to disallow the amended and supplemental report, especially the items to which they objected, and that the administrator's letters be revoked. On September 11 the administrator, pursuant to the court's permission, filed a supplement, but in addition to mere corrections the account of August 18 was amended substantially. There never was any hearing upon the account as thus supplemented. On March 5, 1925, the court made an order overruling the objections, and approving the account as finally made and supplemented. The court declared that the administrator "has been guilty of neglect and mismanagement of the estate, and for such conduct hereby revokes the letters of administration of the said James G. Woods, said revocation to take effect immediately on the fifth day of March, 1925." From the order approving and settling the account the objecting heirs have appealed.
We approve the court's action in removing the administrator from his trust, but disapprove its approval of his account.
It is the duty of an administrator to take into his possession[1] all the estate of the decedent, real and personal, to collect all debts due the decedent or the estate, to discharge all obligations of the decedent and the estate, so far as possible, and to distribute the remaining property, if any, to the heirs or others entitled thereto; and to do these things under the supervision of the court with all reasonable expedition. (See secs. 10257, 10138, 10139, Rev. Codes 1921.) "The policy of the statute requires the administration to be conducted *Page 456 
speedily to a close." (In re Tuohy's Estate, 33 Mont. 230,83 P. 486; State ex rel. Mannix v. District Court, 51 Mont. 310,152 P. 753; 11 Cal. Jur. 231.)
Except that the administrator seems to have taken possession of all of the decedent's property his conduct of the estate has been in flagrant disregard of the foregoing requirements. Indeed, in examining the administrator's doings as disclosed by the record before us, we find his accounts and reports as remarkable for what they do as for what they do not show. The administrator did not keep clear, distinct and accurate accounts of his management of the estate, as he should have done (24 C.J. 924); indeed, he did not keep any accounts at all. That he did not seek the advice of counsel as to the manner of conducting the estate is fairly inferable from the conditions shown by the record; if he did, it may be inferred that he did not follow counsel's advice, for a lawyer would not advise him to conduct the estate's affairs as he did. He says he once consulted the district judge about buying some machinery but there is no order of the court in the record authorizing him to do so. He operated the estate as a going concern for over four years, borrowed money, paid interest, bought and sold personal property and the like, all without any order of court. He seems to have conducted the estate as if it were merely his own personal affair, and regardless of the other heirs.
At the end of the six months' period following his appointment, he did not render "an exhibit under oath, showing the amount of money received and expended by him, the amount of all claims presented against the estate, and the names of the claimants, and all other matters necessary to show the condition of its affairs," as required by section 10288. Neither did he file with the district court within thirty days after the expiration of the time mentioned in the notice to creditors within which claims against the estate might be presented, a full account and report of his administration, as provided by section 10294. *Page 457 
And right here it may be as well to say that unless special and sufficient reasons appear compelling a different course, it is the duty of an executor or administrator forthwith, after the expiration of the period provided for the presentation of claims against the estate to proceed with the utmost expedition to wind up the affairs of the estate. Mismanagement of the estates of the dead, and the long delays which too often are permitted in the settlement thereof, often come very near spoliation. The courts are charged with the solemn duty of seeing that there shall not be any spoliation either with ill or good intent. (Mr. Justice Milburn, in State ex rel. Eakins v. District Court, 34 Mont. 232,85 P. 1024.)
We do not incline to the opinion that this administrator has been guilty of willful wrongdoing but that there has been "a very grave and probable want of understanding on his part," cannot be gainsaid. (In re Courtney's Estate, 31 Mont. 625, 79 P. 317.)
What creditors' claims, if any, were presented within the period limited by the notice to creditors we are not given to know. According to the account filed August 18, 1924, six claims aggregating $2,446.75 then had been presented to the administrator. Of these, two were presented by the Commercial Bank Trust Company, one for $900 and the other for $1,000. The $900 claim embraced two notes, one for $800 and one for $100, while the claim for $1,000 was a note secured by a second mortgage on the real property. The others were those of E.R. Patterson for $8.50, Dorman Kellogg for $70.80, Dr. Clayborne for $15, and Patterson Undertaking Company for $452.45.
For the purpose of paying the debts of the estate, the administrator, in October, 1920, obtained an order authorizing him to sell the personal property. Pursuant thereto he held a public sale on October 30, 1920, but we do not find that he ever made report of the same, as required by section 10197, Revised Codes of 1921, unless the "list of personal property sold at the administrator's sale," included in the amended and *Page 458 
supplemental account and report, may be considered such. The property sold consisted chiefly of farm produce, livestock, machinery and equipment.
The total receipts from the sale aggregated $3,585.70. It seems that the property sold brought something over $300 above the appraised value; what became of the property not sold, except a share of stock of the Duck Creek Telephone Company, appraised at $150, which the administrator still has, is not clear from the record.
From the money realized at the sale, but $1,044.80 was applied in payment of the claims above mentioned. This sum was paid to the Commercial Bank Trust Company, and took up the $900 claim as well as paid the interest then due on the other. Notwithstanding that the claims of Dr. Clayborne and the Patterson Undertaking Company were preferred (sec. 10307, Rev. Codes 1921), they were not paid; so far as the record discloses these have never been paid in whole or in part. The administrator paid the taxes, amounting to $154.85. A payment in 1920 of $85 to the register of state lands, being an annual payment "on account of state land purchase," probably was justified, although the evidence respecting the item is meager; but we note that payment for the succeeding years was not made. The remainder of the money, it seems, was retained by the administrator for "running expenses," except that a payment of $420 was made to the Commercial Bank Trust Company November 23, 1920, for "interest on $6,000 first mortgage on Elizabeth Woods Jennings' land." As we shall see presently we do not know whether this mortgage claim was ever presented to the administrator.
The property of the estate consisted of a farm valued at $15,000 and personal property valued at $4,536, according to the inventory and appraisement. The personal property embraced farming machinery and equipment, and livestock consisting of[2] horses, cattle, sheep and hogs. Crops of hay and grain were growing upon the farm and harvest time was *Page 459 
approaching. The administrator proceeded to care for and harvest the crops. Under the circumstances this course was proper; it benefited the estate by preserving its property. Any different course would have been unwise and might have resulted in loss. (24 C.J. 57; 11 Cal. Jur. 1012.) For this purpose, it would seem, but without obtaining any order of the court, he borrowed $200 on July 12, $200 on July 22, and $250 on August 19, for which he assumed to give the notes of the estate, engaging to pay interest at ten per cent. He also purchased upon credit wherever he saw fit to do so. It may be considered that the farming operations incidental to harvesting the crops which were growing on the farm at the time the administrator took possession were concluded as early as the latter part of October, 1920, for at the sale of October 30 it appears that all the farming machinery and implements were sold.
How much the farm produced in 1920 the administrator is unable to tell. Two hundred and twenty-five tons of alfalfa hay were disposed of at the sale for $1,620. Approximately eleven tons of timothy and clover hay were harvested. As to this the administrator testified: "I sold over two tons of timothy and clover, and the rest was fed. Mr. Jennings used it for feed for his stock and putting in his crop in the spring and summer." He said it was eaten by "the estate's stock," but he added that among the stock fed were two horses belonging to Jennings. (Undoubtedly the spring and summer referred to were those of 1921.) He did not remember how many acres were sown to oats in 1920, and did not know the amount of oats produced; the amount he said would be shown by the threshing bill, but that could not be found. He admitted that some oats might have been fed by Mr. Jennings. At the sale but 3,950 pounds were sold. Barley was raised on the place in 1920; he did not know how much, but thought all was sold at the sale; $109 was realized from this source. Potatoes were raised in 1920; some were "turned in to the Yellowstone *Page 460 
Store Company," all that were sold. The rest were used upon the farm, probably some fed to the hogs. No explanation is given why all the produce and livestock were not sold October 30.
The expenses incurred by the administrator in operating the farm for 1920, as given by his counsel, are $2,003.65. As his counsel say, "it is quite impossible to determine with any accuracy whether he conducted the estate ranch on a profit or loss basis" in 1920. How much his expenses were for the period beginning with the date of his qualification as administrator and ending October 31, 1920, we are unable to say, and this must be ascertained upon further proceedings. From the showing made we are not convinced that the affairs of the farm during the last-named period were administered within the limits of reasonable economy.
When the administrator's account again comes before the district court for consideration it will be the duty of that court to determine the reasonable expenses which should have been incurred and paid by the administrator in harvesting and marketing the crops of the estate during the year 1920; that amount and no more should be allowed.
Upon this basis, and after a very careful examination of the doings of the administrator as he has reported them, we are unable to perceive any good reason why the administrator did not dispose of all the personal property, pay all the debts and liabilities of the estate and of the decedent and turn over the real estate to the heirs, subject to the first mortgage, immediately after the expiration of the period for the presentation of creditors' claims. There may be good reasons to the contrary, but they are not apparent on the face of the[3] record. At any rate, immediately after the expiration of the period aforesaid the administrator should have paid the money then in hand upon the claims which had been presented and allowed and upon the proper expenses of administration as fixed by law, or by court order. Upon the new hearing the court should *Page 461 
determine that amount and should charge the administrator interest thereon; for, instead of disbursing the money as he should have done, he used it in his own business — that of operating the farm.
Without justification or excuse, so far as we can see, and[4] without consulting anybody as to his right to do so, the administrator operated the business of the decedent as a going concern ever after October 31, 1920. In pursuance of this policy he purchased machinery to take the place of that which he had sold in October, 1920, bought groceries, meats and other farm supplies, paid the wages of the help and sold the products from the farm, together with the livestock, without any order of the court and without any reference to the supervisory control of the court. He gave permanent employment to James Jennings, the husband and heir of the decedent, from July 9, 1920, to July 9, 1921, at $75 per month, and from July 9, 1921, to August 18, 1924, at $50 per month, which, together with Mr. Jenning's board and lodging, he assumed to pay from the assets of the estate. He also employed Maggie Jennings at $40 per month and board for the months of June, July, August and September, during the years 1921, 1922, 1923 and 1924, and throughout the other months he permitted her to board upon the farm at estate expense. He permitted James and Maggie to keep and pasture their stock upon the farm without charge, and to feed their chickens from the farm produce and gave them all the garden produce raised. They fed their livestock from the hay and grain raised upon the farm without charge. The administrator himself used the pasturage, hay and grain of the estate for his livestock, fixing his own charges for so doing.
Under ordinary circumstances an administrator is not permitted to engage the assets of an estate in trade or business. (24 C.J. 55; 11 Cal. Jur. 1027.) If without express authority from the court (which authority is to be granted by the court only in cases of extraordinary exigency) an administrator *Page 462 
carries on the business of an estate beyond the point required in winding up its affairs, he does so at his peril (In reConnolly's Estate, 73 Mont. 35, 235 P. 408); if in so doing he is fortunate enough to make a profit, it inures to the estate, for a trustee is not permitted to use or deal with trust property for his own benefit (secs. 7889, 7897, Rev. Codes 1921; In reRodgers' Estate, 68 Mont. 46, 217 P. 678; In re Eakins'Estate, 64 Mont. 84, 208 P. 956; 11 Cal. Jur. 658). If, in pursuing his venture he meets with a loss, the loss is his. (Inre Rose, 80 Cal. 166, 22 P. 86; Riedy v. Bidwell, 70 Cal.App. 552,233 P. 995. And see Campbell v. Faxon, Horton Gallagher, 73 Kan. 675, 5 L.R.A. (n.s.) 1002, 85 P. 760; Gum
v. Frost (D.C.), 4 Fed. 745.)
If an administrator puts the personal estate to his own use he is chargeable with the value of its use, or with the actual profits, if any, which he has made by its use, at the election of the parties interested in the distribution of the estate; "and, if a loss has ensued thereby, he is not only not entitled to be made whole, but is, notwithstanding, liable for use, for to so use the property of the estate is a breach of his trust, and the profits which he may have made are the earnings of the estate, and must go with it." (Walls v. Walker, 37 Cal. 424, 99 Am. Dec. 290.) He is held to a like diligence in the management of[5] the real estate and its issues and in respect thereto to a like measure of accountability. As he is entitled to the real estate for the purposes of administration, "the same rule must apply with reference to the rents and profits which in the exercise of ordinary care and diligence ought to be received from it. So if he has occupied it himself, or by his negligence has failed to secure from it such reasonable amount of revenues in the way of rents and profits as it ought to yield, he must be charged with their loss." (In re Dolenty's Estate, 53 Mont. 33,161 P. 526; Walls v. Walker, supra; In re Rose, supra;Succession of Sparrow, 39 La. Ann. 696, 2 So. 501.)
Counsel for the administrator concede that his loss for the year 1921 was $735.70; they claim a profit for the year 1922 *Page 463 
of $138.74; for the year 1923 they concede a loss of $21.82. The record for 1924 is incomplete. From all their figures they claim a profit from farming operations during the four years of $283.02. The objecting heirs do not concede this. It is clear to us that the reasonable rental value of a productive farm valued at $15,000 has not been received during any year. Upon this record it must be held that the administrator is liable for the reasonable rental value of the real property from October 31, 1920, to March 5, 1925. Also he must be charged with interest at the legal rate upon the annual rentals, for which he is liable from the time the same should have been paid. (In re Rodgers'Estate, supra; In re Eakins' Estate, supra; In re Ricker'sEstate, 14 Mont. 153, 29 L.R.A. 622, 35 P. 960.)
A great deal of the transcript is taken up by an attempted explanation of the sums of money received and paid out by the administrator in his business of operating the farm. As it must be held that the venture was his personal, rather than his representative business, and that he is accountable for the reasonable rents, issues and profits which the farm should have yielded, all of these transactions which have to do with his farming operations in the years 1921, 1922, 1923 and 1924 need not enter into our consideration except as they bear upon his liability for estate property for which he has failed to account or has misapplied.
At the sale the administrator seems to have sold all the farm[6] machinery. In the spring of 1921 with the estate's money, he purchased machinery to take the place of that sold, and this he used in his operations. He must be charged with the amount paid out for the machinery, with interest. Whatever appears in the inventory and which he has failed to account for he must be charged with. (Sec. 10282, Rev. Codes 1921.) Likewise he must account for the produce of the livestock not disposed of at the sale; and if he cannot account for it he must be charged its market value. Livestock of the estate *Page 464 
which he killed for his own use while operating the farm after October 31, 1920, he must pay for.
It appears that at the sale of October 30, 1920, the[7] administrator sold certain property to J.E. Cameron for which he was to receive $43 or $43.50. The property was delivered. The check which Cameron gave in payment was dishonored, but it seems that he subsequently paid in $20 on account of the sale. The balance, however, is uncollected and the administrator is liable therefor.
During the year 1923, without an order of court, the[8] administrator sold a team of horses to James Jennings for $200. This amount, it seems, was in part payment for services alleged to have been rendered by Jennings to the estate. As to this item the decision in Re Dolenty's Estate, supra, is decisive. The court should have charged the administrator with the market value of the horses upon the ground that his disposition of them had been made without authority. And, generally, the same may be said as to any other property of the estate which he disposed of without the authority of the court.
At different times the administrator paid himself certain sums of money. The money paid was for services rendered by himself for labor, and the furnishing of farm machinery and implements for farming the real estate. The total of the charges, it seems, is $294. As he was operating the ranch without any authority from the court, and as none of these payments were authorized by the court, he must be charged therewith.
The administrator did not have any right, unless acting under[9] the order of the court, to borrow money and pledge the credit of the estate therefor. (First Nat. Bank of White SulphurSprings v. Collins, 17 Mont. 433, 52 Am. St. Rep. 695, 43 P. 499.) In view of the apparent emergency probably the court was justified in approving his course in borrowing money in July and August and repaying the same with interest. But for the amount of interest paid by the *Page 465 
administrator upon money borrowed by him after October 31, 1920, he is liable personally.
Payments in the sums of $420 and $427.35 were made by the[10] administrator to the Commercial Bank Trust Company. These, it is explained, were interest payments upon a $6,000 first mortgage owned by Norman B. Holter, covering the real estate of the decedent. When the account of August 18th was filed, this $6,000 loan was not mentioned as one of the claims which had been presented against the estate. During the hearing, as we have seen, at the request of counsel for the administrator the court permitted the filing of a supplement to correct errors which appeared in the August 18 account. Counsel for the objecting heirs insist that no opportunity to contest any item appearing in the amendments was given and they say in their brief that if they had been given the opportunity they could have shown that in fact no claim of any kind was ever filed or presented to the administrator by Mr. Holter, by reason of which they assert that the interest payments were not lawful. This does not follow necessarily. Section 10194, Revised Codes of 1921, provides: "If there be any debt of the decedent bearing interest, whether presented or not, the executor or administrator may, by order of the court or judge, pay the amount then accumulated and unpaid, or any part thereof, at any time when there are sufficient funds properly applicable thereto, whether said claim be then due or not; and interest shall thereupon cease to accrue upon the amount so paid." It is not asserted that the mortgage is not a bonafide lien upon the estate lands and it may be that it was to the advantage of the estate and all concerned therein to pay the interest as was done. The payments made without an order of the court or judge were irregular and may be disallowed unless the court be of the opinion that they were made to the estate's advantage. Upon the new hearing, if the facts warrant, the court may approve these items. *Page 466 
A controversy exists as to the ownership of certain sheep[11] which were in the possession of the decedent at the time of her death. She had paid the taxes upon them in 1919 and 1920, and had received the 1919 wool crop. The administrator did not take possession of them until after his appointment and then only when he took possession of the estate property. He personally took the wool crop in 1920 and succeeding years and claims the sheep were never the decedent's, but always his. It will not serve any useful purpose to discuss the details of this item, but we think, in view of all the circumstances, the court should have inclined to the view that prima facie the sheep were the property of the estate; thus the estate's claim to them and their increase and produce would have been preserved rather than jeopardized. The court, sitting in probate, could not try any question of title; that question must be resolved in another forum. (State ex rel. Barker v. District Court, 26 Mont. 369,68 P. 856; In re Dolenty's Estate, supra.) Now that another has taken the place of James G. Woods as administrator, Mr. Woods may assert his claim to this property in an appropriate action.
Counsel for the administrator insist that even if he did[12] transgress his duty by operating the farm, the objecting heirs are estopped from urging personal liability upon him. The reason given for this position is that the objecting heirs "have lived within three miles of the estate ranch, and during all the time must have known that respondent was operating the same, * * * and yet not once during all of the time did they make any objection, nor did any one in their behalf." This position is not tenable. The administrator did not attempt to show that any of his acts with respect to the management of the estate or its property, were done, either expressly or impliedly, with the consent of, or by agreement with, the objecting heirs. The latter certainly did not estop themselves by mere inactivity. The obligation was not upon them but upon the administrator to conduct the affairs of the estate. The administrator *Page 467 
is far short of the requisites to sustain his attempted estoppel. (See 24 C.J. 1018; Ward v. Tinkham, 65 Mich. 695,32 N.W. 901; In re Spann, 51 Okla. 309, 152 P. 68.)
The record does not indicate that the objecting heirs have been remiss in any way. When the administrator filed his first account in March, 1922, they objected. When the matter came on for hearing they were there objecting, and they are still objecting. The condition here is widely different from that shown in Scott v. Tuggle, infra.
During the hearing counsel for the administrator insisted that[13] his account should be "presumed to be correct unless they can show it is incorrect." This is not the law. The burden of proving the correctness of his account rests upon the administrator. (24 C.J. 1017; In re Williams' Estate, 47 Mont. 325,132 P. 421.) When assets are shown or admitted the burden is upon the administrator to account for their proper disposition. (24 C.J. 1018.) Of course, where objections to an account are of an affirmative nature the burden is upon the objector (24 C.J. 1018), as where the heir or creditor seeks to charge the administrator with loss due to negligence. (In reDolenty's Estate, supra.)
The court's rulings respecting the admissibility of the[14] exhibits offered by the administrator were proper, and this whether or not many of the exhibits may be termed vouchers. If these documents, as explained by witnesses, tend to throw light on the subject in controversy, they were admitted properly. Canceled checks, properly indorsed, and receipts for money paid, although not disclosing their purposes on their face, come within this category.
We have not attempted to pass upon all of the items to which objection is made. This opinion already is quite long enough and, we think, indicates our views sufficiently to enable the trial court to rule correctly upon all of these when the matter shall come for hearing again. *Page 468 
The order removing the administrator is affirmed; but in so far as it approves the account of the administrator it is reversed for further proceedings in conformity with this opinion. The appellants shall recover their costs on this appeal.
ASSOCIATE JUSTICES HOLLOWAY, GALEN and MATTHEWS concur.
MR. JUSTICE STARK, being disqualified, did not hear the argument and takes no part in the foregoing decision.