GRAUMAN, APPELLANT, v. CHAMBERS ET AL., RESPONDENT.
No. 8809.
Submitted May 25, 1948.   Decided July 3, 1948.
198 Pac. (2d) 629.

Mr. Frank L. Riley and Mr. James P. Kennedy, both of Butte, for appellant. Mr. Riley argued the cause orally.

Mr. Oscar C. Hauge, of Havre, for respondents. Mr. Hauge argued the cause orally.

MR. JUSTICE CHOATE delivered the opinion of the court.

This is a suit in equity to compel defendant Chambers to account to plaintiff for his dealings with her property and estate as her guardian de facto while plaintiff was committed to the Montana State Hospital. Chambers' bondsman is also joined as a defendant.

The trial court, the Hon. R. M. Hattersley sitting without a jury, made findings of fact and conclusions of law in favor of defendants and entered a decree that plaintiff take nothing by reason of the action and that the acts, expenditures and accounts of the defendant Chambers as guardian de facto of the person and estate of plaintiff, an incompetent, were approved, allowed and confirmed.

This litigation arises from the following facts which, unless otherwise indicated, are not in controversy:

*The de facto Guardianship.* On March 27, 1930, in the district court of Liberty county, plaintiff was adjudged to be an insane person and was committed to the Montana State Hospital at Warm Springs. On March 31, 1930, a petition for appointment of a guardian of plaintiff's person and estate was filed in the district court of Liberty county by J. H. McAlear, as a friend of plaintiff. This petition was set for hearing by the clerk of the court and notice of the hearing was given by posting

and mailing. No citation was, however, issued or served on plaintiff and no notice of said hearing of any sort or kind was given to plaintff nor was she produced or present at the time of the hearing. On April 10, 1930, the Hon. C. B. Elwell made an order appointing one Ambrose J. Fey as guardian of plaintiff's person and estate. Fey qualified as such guardian but resigned on July 13, 1933. On July 18, 1933, Judge Elwell appointed defendant Chambers temporary guardian and custodian of plaintiff's estate and ordered and approved his bond as such. On July 31, Judge Elwell appointed defendant Chambers as permanent guardian of plaintiff's person and estate and fixed his bond at $6,000. This bond was given by Chambers and his bondsman, the American Surety Company of New York, and was approved and filed in said proceedings.

No notice was given to plaintiff of the time and place of any hearing in regard to the appointment of a guardian and she was not present at any such hearing.

On June 25, 1942, by judgment of the district court of Liberty county, duly given and made, plaintiff was restored to capacity and to mental competency.

*The Issues.* Plaintiff's complaint, after reciting the foregoing facts relative to her commitment to the Montana State Hospital, the appointment of a guardian, and her subsequent restoration to competency, sets out the following matters which are stated here only in brief summary.

About July 27, 1933, the defendant Chambers, purporting to act as plaintiff's guardian, took into his possession all of plaintiff's property, real and personal, and dealt with and held possession of same until about September 10, 1942. A detailed description of this property is set out in the complaint, comprising stocks and bonds, cattle, household furnishings and equipment, farm implements, dividends from bank deposits, and real estate.

Plaintiff alleges that when returned to her the property was not in the same condition as when Chambers took possession of it in that certain buildings and improvements, household and

farm equipment had been removed from the so-called Grauman ranch and that defendant Chambers has failed and refused to deliver the rest of said property or the increase thereof to plaintiff or to account to plaintiff for the same.

Defendants filed a joint answer. Certain portions of it were stricken on motion of plaintiff and certain amendments thereto were made by interlineation. The first part of this answer admits plaintiff's allegations relative to her commitment to the Montana State Hospital and appointment of Chambers as her actual and de facto guardian; and alleges that Chambers acted in good faith at all times in dealing with plaintiff's property in the belief, under advice of counsel, that he was the legally appointed and qualified guardian de jure of plaintiff's person and estate. The answer further admits that Chambers took possession of certain property as alleged in the complaint but avers that he did so at the request of the court as custodian and guardian, temporary and permanent, and acting in good faith for what he believed to be for the best interests of plaintiff and her estate and that he accounted annually to the district court of Liberty county in the matter of the estate and guardianship of Tillia Grauman, an incompetent.

The second part of the answer sets out the accounting of the defendant Chambers in which is itemized with great minuteness all receipts and expenditures made by said guardian, ranging from bank float charges of a few pennies up to items of several hundred dollars, together with a statement of the manner in which plaintiff's property was handled and disposed of by said defendant. The total receipts (exclusive of real estate) which came into Chambers' possession are set out in detail in his accounting and amounted to $5,925.74. His disbursements similarly accounted for amounted to $5,299.66, leaving a balance of $626.08, which was paid over to plaintiff. The trial court adopted defendant's accounting of his de facto guardianship almost verbatim in its findings of fact.

At the outset of our consideration of this case the status of defendant Chambers as plaintiff's guardian de jure

or de facto must be determined in order to correctly measure the extent of his duties and responsibilities. The briefs of counsel and the findings of the trial court are all agreed that in view of section 10412, Revised Codes of Montana 1935, and the holding of this court in State ex rel. Kelly v. District Court, 73 Mont. 84, 235 Pac. 751, the district court of Liberty county and the judge thereof were without authority to appoint a guardian of plaintiff's person and estate because of the failure to serve on plaintiff notice of the time and place of the hearing on the guardianship petition. This view of the law is correct. Chambers was a guardian de facto as found by the trial court. He was, nonetheless, subject to the duties and liabilities of a guardian de jure in dealing with the plaintiff's property.

"A de facto guardian [of an insane person] will be held subject to all the duties and liabilities of a guardian." 44 C. J .S., Insane Persons, page 209, sec. 86(a). In Kelly v. Kelly, 89 Mont. 229-235, 297 Pac. 470, this court announced the same rule quoted above and stated the further rights and duties of such guardian as follows: "* * * his rights will be recognized so far as to entitle him to an equitable order for expenditures which were made for the ward, and which would have been allowed had the guardian been a legal one. (Citing cases.) Every guardian must manage the estate of his ward frugally and without waste (sec. 10419, Rev. Codes of 1921), and when he has advanced for the necessary maintenance and support of his ward an amount not disproportionate to the value of his estate or his condition of life, and the same is made to appear to the satisfaction of the court or judge, the guardian must be allowed credit therefor in his settlements (sec. 10420, Id.), and a 'guardian must be allowed the amount of his reasonable expenses incurred in the execution of his trust.'"

*Plaintiff's Contentions.* Plaintiff assigns 36 specifications of error, in addition to 10 "questions involved" in her appeal. The first and most important of these questions poses the claim that the defendant Chambers engaged in the *cattle raising business* with plaintiff's cattle and other property; that

he carried on these stock raising operations at a loss and is therefore liable to plaintiff for the amount of such loss. In considering this assignment, the first question to be answered is, Do the facts shown here as to Chambers' dealing with the Grauman cattle constitute "engaging in the cattle business" within the meaning of the authorities relating to the management of property by guardians? "Business" is a very comprehensive term and comprises everything about which a person can be employed. In re Booth, D. C. Okl., 18 F. Supp. 79. The word "business" is of large significance and denotes the employment or occupation in which a person is engaged to procure a living. Allen v. Commonwealth, 188 Mass. 59, 74 N. E. 287, 69 L. R. A. 599. From a narrow or restricted viewpoint a person who performs any act whatever having to do with the care, feeding or handling of cattle may technically be said to be in the cattle raising business. But it does not follow from that fact that every guardian who sells, pastures, feeds, or otherwise protects livestock belonging to his ward, is thereby engaging in the cattle business.

Bancroft's Probate Practice, Vol. II, page 677, section 357, says: "It is clearly not the duty of an executor or administrator to carry on a business for the benefit of the estate, and he is without power or authority so to do, and acts at his peril, unless the will empowers or directs him so to do, or unless, and to the extent that, *it is necessary to preserve the property of the estate.*" (Emphasis ours.) Citing authority.

Bancroft, supra, Vol. II, page 679, section 358, says: "Personal property may of course, be cared for at the expense of the estate until such time as it can be sold to advantage *without constituting a carrying on of business.*" (Emphasis ours.) Citing In re Fernandez's Estate, 119 Cal. 579, 51 Pac. 851.

Chambers' dealing with plaintiff's cattle were as follows: Almost immediately after, as he assumed, he had been appointed as plaintiff's guardian and on July 31, 1933, Chambers took possession of all plaintiff's personal property and at once petitioned the court which he then believed had jurisdiction in

the matter, for an order to sell eight head of two year old steers, four milk cows and a few small items of personal property on the ground that if not sold the cattle would depreciate in value. On September 28, 1933, Chambers filed another petition for sale of personal property liable to depreciate in value. This petition described *all* the personal property belonging to the guardianship except certain securities. In this petition the de facto guardian set up, among other recitals, "that it is not profitable to have the guardianship directly engaged in farming or stock raising"; that he believed his ward was permanently insane; that he had no feed or pasture for the large number of livestock involved and that the personal property was liable to depreciate in value and that he believed a better market could be secured at private sale at that time than could be had in the future because of bad roads, etc. Including the 1933 spring calves, Chambers took into his possession a total of 121 head of livestock found by the trial court to be of the value of $2,300. He disposed of the same under orders of the court which he assumed to be valid as follows:

| | |
|---|---:|
| October 11, 1933, 40 head 1930 calves, sold to A. G. Rudolph, | $ 747.62 |
| October 24, 1933, two milk cows, sold to Marias Sheep Co., | 55.00 |
| September 21, 1933, four horses, sold to A. P. Reid, | 50.00 |
| October 18, 1933, one saddle pony, sold to Ed Alexander, | 4.00 |
| October 28, 1933, one bull, sold to Ben Dolezal, | 65.00 |
| September 28, 1934, sold on open market, seven two-year old steers, eight three-year old steers and heifers, two cows, one yearling heifer and one steer, | 410.36 |
| August 23, 1935, eight yearling heifers and seven yearling steers, | 375.00 |
| one nine-year old Hereford bull, | 50.00 |
| 25 cows and seven suckling calves, | 475.00 |
| (All above cattle sold to L. A. Wiggins) | |

| | |
|---|---:|
| January 5, 1935, two milk cows and one calf, sold to James O'Brien, | 55.00 |
| September 17, 1935, one three-year old steer, sold to Chester Trading Co., | 65.00 |
| November 4, 1935, sold on open market four cows and two yearlings, | 205.11 |
| Receipts of cattle sold | $2,558.69 |

The record in this case is undisputed that the Grauman cattle were in poor condition when Chambers took them over. Weather conditions in the summer of 1933 were very dry and there was neither grass nor water on the Grauman place and the remaining cattle that were in Chambers' care were in no condition to be sold. Accordingly defendant deeming it to be for the best interest of plaintiff's estate tried wintering said livestock in order to get them into condition to sell. He therefore entered into an agreement with Vern Sauer to care for, feed and pasture the cattle for half the 1934 spring calves, which was a reasonable and customary price. Chambers also paid Sauer in addition, 75¢ per month per head for pasturing and feeding the steers. The cows were in poor condition at the time Chambers turned them over to Sauer, the winter of 1933-1934 turned out to be a very severe one and the Grauman cattle came through it in very poor condition and in no shape to go to market. The result of this severe winter was that 14 head of cows and one yearling died. Stock losses were very general throughout the territory. There were 30 calves and Chambers received half of them. The following summer of 1934 was dry and as a result there was a shortage of pasture, grass and hay, as well as water, throughout the entire county. Sauer did not have enough pasture to take care of the Grauman cattle another winter. Therefore in the fall of 1934 Chambers moved the cattle to the Keith and Moffatt places where he paid Moffatt $1 per head per month and Keith $1.50 to feed and care for them. The cattle were kept on the Moffatt and Keith places until the following spring of 1935. Defendant still planned to sell the cattle as soon as market conditions justified but the market continued "in a deplor-

able condition." The summer of 1935 turned off hot and dry, the prairie was burned up and it became a matter of finding pasture which was not available or selling the cattle at once regardless of their condition. Accordingly, Chambers sold the rest of the cattle on the dates above indicated at the best price he could get.

It is our opinion that the foregoing facts do not constitute "engaging in the cattle raising business" in the sense that such activities are beyond the authority of a guardian. The story of this guardian's attempt to keep cattle alive during the disastrous drought years 1933-1935 in the vain hope of being able to get them in condition to sell in a market that kept progressively getting worse, can be duplicated by the thousand. The losses sustained were attributable to adverse weather conditions rather than to Chambers' failure to do what a reasonably prudent man would have done to preserve the cattle and put them in a condition to market.

But if it be conceded that Chambers *did* engage in the cattle business with plaintiff's cattle, not every such "business" is forbidden. Discussing the matter of carrying on business by guardians of insane persons, in 44 C. J. S., Insane Persons, page 196, sec. 85, after stating the general rule that a guardian has no power to engage in business for his ward, the author says:

"* * * but in some jurisdictions the court may direct and order him to continue the business of the ward, although such powers should be exercised with caution.

"It has even been held that the guardian may continue the business without an order of court authorizing him to do so; that the fact that he does so without an order of court only places on him the burden of showing that in doing so he exercised such prudence and sound discretion as amounted to due care, in the event it should be charged that its continuance was not for the best interest of his ward's estate." Citing Sohl v. Wainwright Trust Co., 76 Ind. App. 198, 130 N. E. 282.

Woerner, The American Law of Guardianship, page 473, section 142. says, " 'The guardian of an insane person is a trustee;

* * * as such he has no authority to subject the estate in his charge to the risks and hazards of any trade or business undertaking * * *.' '' Citing Michael v. Locke, 80 Mo. 548. But the author goes on to say, ''the case of Michael v. Locke, so far as it denied the power of the Probate Court to authorize the guardian of an insane person to continue and carry on the business established by the ward * * * was overruled in a later case, construing the statute referred to as investing the Probate Court with large discretionary powers, to direct and order the continuance of the business of the ward. * * * It is rather the duty of the guardian to protect and preserve the business affairs of the ward than to wind them up. To that end the statute has invested the Probate Court with large discretionary powers.''

The above quoted statement of the law sufficiently indicates why In re Jennings' Estate, 74 Mont. 449, 241 Pac. 648, relied on by plaintiff is not applicable to the facts of this case, since it involved an administrator whose duty it was to wind up the estate as speedily as possible, rather than a guardian whose primary duty was to protect and preserve his ward's property.

*Engaging in Farming Business.* Plaintiff's next contention ▉ is analogous to the one just discussed, namely, that Chambers entered into the farming business with one Frank Liska on plaintiff's farm. This claim is predicated on the fact that Chambers leased plaintiff's land to Liska to farm the same on the crop-share basis of 1/5 to the landlord. This transaction did not constitute ''engaging in the farming business'' by the guardian. It was no more than the performance of Chambers' plain duty to manage the property of the ward so as to secure the best available income from the same. It was not Chambers' duty to personally put plaintiff's land into crop and harvest and market the proceeds. What else then could he do to secure an income from the property, except to lease it? Discussing the rights and liabilities of executors which in some respects are identical with those of guardians of incompetents, since both are trustees, Bancroft's Probate Practice, Vol. II, page 679, says, ''Preservation, care, management, and marketing of growing

crops is clearly part of the representative's duties, and for neglect or misfeasance permitting the crops to go to waste and be lost he may be liable. Necessary expenses in the performance of such duties are proper expenses of administration."

It is true that Chambers did not comply with the procedure outlined in sections 10427 et seq., Revised Codes of Montana 1935, but there is no showing of any loss or detriment to the estate by reason of such noncompliance.

Moreover, there is no showing that the leases to Liska were not for the benefit and best interests of the estate. Liska paid the taxes and Chambers realized from him for the sale of grain $1,218.86. We perceive no reason on the record why Chambers is under the duty to account to plaintiff for the $262.55 which plaintiff asserts was expended in a matter not for her benefit. The fact is that while these expenditures for lumber, fence posts, etc. were in part for Liska's convenience, the same were primarily for repairs and improvements of plaintiff's property.

*Fey's Bills, Fees and Attorneys' Fees.* Plaintiff next contends that Chambers made improper disbursements from plaintiff's funds for obligations incurred by Ambrose J. Fey, plaintiff's former de facto guardian. It is first alleged that these expenditures, aggregating $461.86 were allowed "without the presentation of verified claims" which would alone determine whether or not they were just claims due from the ward. Citing 44 C. J. S., Insane Persons, page 224, sec. 87. The citation from C. J. S. does not support the statement of law above quoted from plaintiff's brief. Nor has our attention been called to any such authority. Furthermore, none of the parties to this action, not even the district judge, suspected until the institution of this action, that the guardianship proceedings in which Ambrose Fey had been personally appointed as a guardian de jure were void and that they could not rely on the records, including Fey's accounting, accompanied by his verification. There is no evidence that the expenditures listed were not proper or that they were incurred in any farming or stock raising business of Fey. The trial

court properly held that they were reasonable, necessary and proper.

*Reasonableness and Necessity of Expenditures.* In her proposed finding No. 23, plaintiff lists some 17 items totalling $62.54 which she asserts were unnecessary and improper and not for the support of plaintiff or the preservation of her property. The contrary is so apparent that this assignment merits little comment. The guardian was certainly entitled to carry a bank account for the deposit and safekeeping of his ward's money and to pay the trifling amounts necessary for government tax and float charges on checks; also to spend a small sum ($10) for advertising the sale of personal property. The only item in this list of any magnitude is $41.50 paid to the Liberty county abstract company for an abstract of title to the flour mill property. This item was apparently expended for an abstract upon payment by Andrew and Marie Hansen of the notes and mortgage for some $1,100 which they had given Chambers' predecessor, Ambrose Fey, for the purchase of a small tract of land comprising a flour mill property. We see nothing unreasonable about this item which apparently the trial court concluded was a necessary expenditure in order to complete the sale of the above tract of land.

*Fees of Chambers.* Section 10425, Revised Codes of Montana 1935, provides that "Every guardian must be allowed the amount of his reasonable expenses incurred in the execution of his trust, and he must also have such compensation for his services as the court or judge in which his accounts are settled deems just and reasonable." In the Kelly case, 89 Mont. 229, 297 Pac. 470, we held that upon the restoration of a ward to capacity one who had served for six years as a guardian de facto in the honest belief that he was a guardian de jure, is entitled to credit for such expenditures made for the ward as would have been allowed had the appointment been legal and we remanded the case to the trial court to fix a reasonable compensation for the services of such guardian. There can be no doubt as a matter of law but that Chambers was entitled to a just and

44

reasonable compensation for his services to be fixed in the sound discretion of the court. For nine years, from July 27, 1933, to September 23, 1942, Chambers had performed services for plaintiff's estate. He had made many repairs to her farm buildings, leased her property, sold her crops, handled, pastured and sold her cattle, and generally cared for the property of his ward. For this service the court allowed him $785 which was the same amount allowed on the settlement of the accounts of the de facto guardian by the district court as follows: 1934-1935 accounts, $150 each; 1936, $100; 1937-1941 inclusive, $75 per year and a final fee of $35.

Aside from defendant's own testimony, there is plenty of evidence from the witnesses Dodds, Keith and Gau, supporting the court's allowance and there is no contrary testimony. The record on this phase of the case preponderates in support of the trial court's finding.

*Attorney Fees.* As to attorneys' fees the same rule applies as to the guardian's fees. "The matter of the allowance of counsel fees to a guardian of an insane person is within the discretion of the court, and ordinarily he is allowed reasonable counsel fees in the management of the estate." 44 C. J. S., page 218, sec. 87(3). Our statute, section 10425 as above noted allows the guardian his reasonable expenses incurred in the execution of his trust and attorney fees are obviously of that character. Also in Re Allard Guardianship, 49 Mont. 219, 141 Pac. 661, 665, involving an allowance of an attorney's fee of $750, this court said: "So far as disclosed by this record, there was little done by the attorney who looked after this matter; but in any event the amount to be allowed in any given case is so far within the control of the lower court's discretion that, in the absence of evidence disclosing a clear abuse of that discretion this court will not interfere." Freese v. Pennie, 110 Cal. 467, 42 Pac. 978.

In the case at bar the court allowed attorney fees to J. H. McAlear totalling $510, which plaintiff considers unreasonable and asks that it be reduced to $90. Here again as in the case of the amount allowed Chambers, the attorney fee was fixed by

the court in the instant case as well as in the defective guardianship proceedings. Its reasonableness is attested by the evidence of two attorneys. Wilbur Werner who testified to a value of $125 to $150 a year, and Oscar Hauge, who testified to a valuation on a diminishing scale of from $150 to $75 a year. There was no contrary testimony and we cannot say that the allowance was clearly and palpably too great.

*Payments to Montana State Hospital.* Chambers paid $565 for plaintiff's care in the state hospital. Plaintiff says that this payment was not made "until ordered by Judge Elwell" on December 25, 1940, and that after making this payment Chambers still had a balance of cash on hand of $1,087.54. We are uncertain as to just what breach of duty this assignment is intended to charge. Granted that it is the duty of a guardian to support his ward, there is no showing in the record that Mrs. Grauman was not properly "supported" during the 13 years she was in the state hospital or that if her guardian had during that time paid more money for her support in that institution she would have received more or better care. The only party who (according to the record) can be said to have been prejudiced by Chambers' failure to pay a larger amount to the Montana State Hospital for her support is the state of Montana and it is making no complaint in that respect. Mrs. Grauman has suffered no prejudice. Rather she has benefited by virtue of the fact that more of her estate was not expended in paying for her support at the hospital.

*Good Faith.* We have examined the record in this case with care in an endeavor to ascertain how or in what respect defendant Chambers violated his duty under the law as the de facto guardian of the plaintiff's person and estate. While there may be a few items scattered here and there throughout the lengthy record whch might be condemned by a strict and over-critical interpretation of the defendant's acts, our total impression of this appeal is that it presents no occasion for this court to interfere with the findings of the trial court, which as we view them are supported by substantial evidence.

On the record, there can be no doubt of Chambers' good ██ faith. For nine years he reported with meticulous care and accuracy to the district court which he had every reason to assume had appointed him as de jure guardian of plaintiff's person and estate, his management of her property. While there is some conflict on the question of his protection of the buildings, barns, etc., on plaintiff's land we think the record as a whole shows that he did make substantial improvements to his ward's property and that he surrendered the property in better condition than when he received it. We have already indicated our views relative to Chambers' handling of the farm and livestock. It does appear that probably the estate would have been better off financially, although by how much is problematical, had Chambers sold the rest of the cattle in 1933 for whatever he could get for them, even though they were in poor shape and in no condition to market, instead of carrying them over in the two following seasons and thereby running into the "bad years" that ruined many another rancher in Montana. In doing so, however, Chambers used his best judgment and did what he as a reasonable person believed was for the best interests of plaintiff's estate. For this loss and in the absence of any suggestion that he acted for his own profit or advantage, Chambers should not be penalized nor compelled to account for losses incurred in the care and preservation of plaintiff's property resulting from the unusual drought conditions and the accompanying lack of pasture, water and feed.

We find plaintiff's other contentions without merit. This ██ being a suit in equity and there being ample substantial evidence to sustain the trial court's findings and judgment they cannot be disturbed on appeal. Judgment affirmed.

Mr. Chief Justice Adair and Associate Justices Gibson, Angstman and Metcalf, concur.

Rehearing denied November 5, 1948.